CALVIN A. THOMAS, TRANSFEREE OF METRO "400" INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Thomas v. Commissioner
Docket Nos. 11998-77, 11999-77, 12000-77, 157-78, 831-78, 1140-78.
United States Tax Court
T.C. Memo 1981-387; 1981 Tax Ct. Memo LEXIS 362; 42 T.C.M. (CCH) 496; T.C.M. (RIA) 81387; July 28, 1981. *362 A received an option to purchase some undeveloped land which was zoned for agricultural use. Together with B and C, A formed a corporation, M, to which A's option was transferred. A owned 100 percent of M's issued and outstanding stock while B and C held options for one-third of M's stock. After M succeeded in having its land rezoned for residential use, M adopted a plan of liquidation and sold the land. No other activities were conducted with regard to the land; M made no physical improvements to the land. Held, M was not a collapsible corporation as defined and thus is not required to recognize the gain from the sale of its land; A, B, and C are not liable as transferees. Held further, deficiencies in and additions to A, B, and C's income taxes determined. James R. Harper, for the petitioners. Maurice W. Gerard, for the respondent. IRWIN
MEMORANDUM FINDINGS SOF FACT AND OPINION IRWIN, Judge: Respondent has determined that petitioners are liable under section 6901 [2] for the corporate income tax of Metro "400" Inc. as follows: Taxable
Docket No.
Petitioner
Year Ended
Amount
11998-77
Calvin A. Thomas,
June 30, 1973
$ 281,528
Transferee
11999-78
Goodwyn Cates,
June 30, 1973
281,528
Transferee
12000-77
Charles O. Cates
June 30, 1973
281,528
Jr., Transferee
Respondent *363 has also determined deficiencies in and additions to petitioners' Federal income taxes as follows: Taxable
Addition to Tax
Docket No.
Petitioners
Year
Deficiency
Sec. 6653(a)
157-78
Goodwyne Cates
1973
$ 229,505.64
$ 11,475.28
and Wynelle
J. Cates
1974
174.98
1975
489.54
831-78
Calvin A. Thomas
1973
71,691.57
and Joan
Thomas
1140-78
Charles O. Cates,
1973
108,587.49
5,429.37
Jr. and Estate
of Billie B.
Cates, Deceased,
Charles O.
Cates, Jr.,
Administrator After concessions by respondent, the issues remaining for decision are: (1) whether Metro "400" Inc. was a collapsible corporation as defined by section 341 and thus not entitled to the nonrecognition of gain, provided by section 337, on the sale of its only asset; (2) if Metro "400" Inc. was a collapsible corporation whether all of Metro "400" Inc.'s shareholders elected to be subject to the provisions of subchapter S, as required by section 1372(a); (3) if Metro "400" Inc. is not an electing small business corporation and is required to recognize gain from the sale of its sole asset, whether petitioners Calvin A. Thomas, Goodwyn Cates, and Charles O. Cates, Jr., are liable as transferees for the corporate income tax due from Metro "400" Inc.; (4) the nature of the *364 gain realized and recognized by petitioners Goodwyn Cates and Charles O. Cates, Jr. from their sale of options for stock [3] of Metro "400" Inc.; (5) whether petitioner Goodwyn Cates received a contract right for a commission upon the liquidation of Cates Realty Company, Inc. in 1973 or whether he constructively received commission income upon the sale of land by Metro "400" Inc. in 1973; (6) whether petitioner Goodwyn Cates is entitled to auto depreciation expenses in excess of the amounts allowed by respondent for 1973, 1974, and 1975; (7) whether petitioner Goodwyn Cates is entitled to deductions for condominium expenses and depreciation for 1973; (8) whether petitioner Goodwyn Cates is liable for the section 6653(a) addition to tax for 1973; (9) whether petitioner Calvin A. Thomas is entitled to a deduction for interest expenses in excess of the amount allowed by respondent for 1973; (10) whether petitioner Calvin A. Thomas received unreported income of $ 1,760 in 1973; (11) whether petitioner Charles O. Cates, Jr., *365 received unreported income of $ 5,704.66 in 1973; (12) whether petitioner Charles O. Cates, Jr., is entitled to auto and truck depreciation expense in excess of the amount allowed by respondent for 1973; (13) whether petitioner Charles O. Cates, Jr. is liable for the section 6653(a) addition to tax for 1973. FINDINGS OF FACTS Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Calvin A. Thomas and Joan Thomas filed their 1973 joint Federal income tax return with the Internal Revenue Service Center in Chamblee, Georgia. They resided in Alpharetta, Georgia, when their petitions were filed herein. Petitioners Goodwyn Cates and Wynelle J. Cates filed their 1973, 1974, and 1975 joint Federal income tax returns with the Internal Revenue Service Center in Chamblee, Georgia. They resided in Atlanta, Georgia, when their petitions were filed herein. Petitioners Charles O. Cates, Jr. and Billie B. Cates filed their 1973 joint Federal income tax return with the Internal Revenue Service Center in Chamblee, Georgia. They resided in Atlanta, Georgia, when their petitions were filed herein. *366 Billie B. Cates died in August 1978 and petitioner Charles O. Cates, Jr. was appointed administrator of her estates. Metro "400" Inc. filed its corporate income tax return, Form 1120S, for the taxable year ended June 30, 1973, with the Internal Revenue Service Center in Chamblee, Georgia. Metro "400" Inc.'s principal place of business was Atlanta, Georgia. Joan Thomas and Wynelle J. Cates are petitioners herein solely because of the filing of joint returns with their spouses. The Estate of Billie B. Cates is a petitioner herein solely because Billie B. Cates filed a joint return with her spouse. Accordingly, any references hereinafter to petitioners shall be to Calvin A. Thomas, Goodwyn Cates, and Charles O. Cates, Jr., collectively. ISSUES (1) - (5)
The principal disputes in these consolidated cases revolve around the purchase and resale of 258.477 acres of unimproved real estate by Metro "400", Inc., a corporation formed and utilized solely for that purpose by the petitioners. Sometime in early 1972 petitioner Calvin A. Thomas (hereinafter sometimes referred to assCalvin) was informed by a friend who worked at Income Properties, Inc. (a real estate company) that 258,477 acres *367 of land located near Alpharetta, Georgia, was for sale. Alpharetta is a small community in Fulton County, Georgia, approximately 12 to 15 miles from Atlanta. The land is located on the highest elevation in north Fulton County and, with the exception of its east side, was abutted by roads, including State Highway 400 (a major expressway). The land was zoned solely for agricultural use. Calvin, a resident of Alpharetta, lived approximately one block from the land and was familiar with the area. Calvin recognized that the land represented an excellent opportunity for profit. Calvin contacted petitioner Charles O. Cates, Jr. (hereinafter sometimes referred to as Charles) concerning acquisition of this acreage. [4] Charles also felt that the land represented a terrific opportunity for profit. Charles discussed the opportunity with his brother, petitioner Goodwyn Cates (hereinafter sometimes referred to as Goodwyn), an elected member of the Board of County Commissioners of Fulton County, Georgia. One of the responsibilities of a County Commissioner was to vote on resolutions concerning approval of petitions requesting zoning changes. The petitioners agreed that the land should be *368 acquired and rezoned for apartments, if possible. Charles and Goodwyn were both involved in the real estate business and each owned his own real estate company. Charles' real estate company dealt primarily in residential resales. The nature of the activities of Goodwyn's real estate company is not in the record. On May 23, 1972, Calvin signed a contract through Income Properties, Inc. (as broker) to purchase the land from its owners, R. Randall Rollins, Gary W. Rollins, Henry B. Tippie, Earl F. Geiger, and W. Falk, III. The agreed price was $ 6,600 per acre, or a total price of $ 1,705,948.20. The terms of the contract were as follows: Calvin was to pay $ 20,000 earnest money (later refunded) May 23, 1972, make a 20 percent cash payment at closing, assume an existing mortgage of $ 199,005.82 and pay the balance with a note secured by a deed. The note was payable in 10 equal installments on principal plus 7 percent interest per annum on the unpaid balance. The first payment on the note was due 1 year from closing. Calvin retained the right to pay the entire loan *369 off at any time after the end of the calendar year in which the sale was closed. [5] Petitioners retained an experienced attorney, J. Ralph McClelland, Jr. (hereinafter sometimes referred to as McClelland) to advise them. McClelland advised petitioners to form a corporation to hold the land. On July 28, 1972, Metro "400" Inc. (hereinafter referred to as Metro) was incorporated under the laws of the State of Georgia. The Articles of Incorporation provided that the corporation was organized for "buying, selling, exchanging, developing, investing in, and otherwise dealing generally, either as principal or as agent for others, in any and all types and kinds of property, real, personal or mixed." Ten thousand shares of no par value common stock were *370 authorized, but Metro was not to commence business until not less than $ 500 had been received for the issuance of shares. The board of directors was comprised of three members: McClelland, Freeman D. Mitchell, and Wayne Jernigan. [6] Calvin transferred the option to purchase the land to Metro. On August 30, 1972, Calvin contacted Baldwin Associates, Inc. regarding a site plan for a rezoning application for the land. Baldwin Associates' fee for the site plan was $ 4,500. At this time the contract for the purchase of the land had not been closed. On or about September 19, 1972, First Palmetto Bank of Palmetto, Georgia, loaned $ 50,000 each to Calvin, Charles, G. W. Whitlow, W. C. Lunsford, Ralph E. Marler, and Frank Alexander, Jr. [7] The unsecured notes evidencing these loans were due in 180 days and provided for 8 percent annual interest. Calvin and Charles each gave Whitlow, Lunsford, Marler, and Alexander notes guaranteeing them against any loss. Goodwyn, who had arranged for the loans from First Palmetto Bank, executed a demand note dated September 18, *371 1972, payable to Calvin and Charles. This note was for $ 100,000 and also bore interest of 8 percent per annum. The $ 300,000 was then deposited in Calvin's bank account. On September 20, 1972, Calvin and McClelland subscribed for 900 and 300 shares of Metro, respectively. Calvin paid $ 500 for his shares. [8] McClelland received his 300 shares as payment for services rendered. [9] *372 McClelland understood that he was to receive 10 percent of the outstanding stock of Metro and 10 percent of the net gain from the sale of the land. On September 21, 1972, the contract for the sale of the land was closed in the name of Metro. calvin gave McClelland a check for $ 350,643.70, which McClelland deposited in an escrow account. The $ 350,643.70 consisted of $ 300,000 in loans from First Palmetto Bank, a $ 16,821.85 loan from each of Calvin and Charles and a $ 17,000 loan from Income Properties (representing virtually all of Income Properties' broker's commission). Goodwyn executed another demand note, dated September 20, 1972 and bearing 10 percent per annum interest, to Calvin and Charles for $ 13,649.64. [10] *373 Prior to the closing of the contract for sale, petitioners discussed methods of providing for their one-third shares of the anticipated profit from the land. Petitioners had already received an offer to sell for $ 9,500 per acre, contingent upon rezoning. Petitioners were certain that with rezoning of the land from agricultural to residential (apartment) use the land would become even more valuable. Petitioners agreed that Charles and Goodwyn's one-third interests would be evidenced by options for Metro stock. Sometime thereafter McClelland drafted documents granting Charles an option for one-half of the shares of Metro. At a later time this was changed from one-half to two-thirds of the outstanding stock of Metro. The option was signed by Calvin, as President of Metro, but undated. Charles then executed an option granting Goodwyn one-half of the shares in Netro held by Charles. This option was also undated. Calvin thereafter executed options dated September 20, 1972 granting Charles and Goodwyn one-third interests in Metro. These documents were identical (except for the names of the optionees) and *374 read, in pertinent part, as follows: That for and in consideration of the sum of Ten ($ 10.00) Dollars and other good and valuable considerations, in hand paid, the receipt and sufficiency of which is hereby acknowledged, the parties of the first part do hereby convey to party of the second part, an irrevocable and continuing option to buy, at and for the same price paid by Calvin A. Thomas for the 900 shares now held by him, nine hundred (900) shares of the common capital stock in Metro "400", Inc.; it being the specific intent of this agreement that upon the exercise of the option herein granted and conveyed, the said Charles O. Cates, Jr. [or Goodwyn Cates] will be the owned of a full one-third (1/3) sinterest in said corporation. These options replaced the earlier undated options. On December 28, 1972 Calvin executed a personal financial statement which listed a 50 percent ownership interest in 258 acres of real estate located on State Bridge Road. The financial statement listed a fair market value of $ 1,500,000 for this 50 percent interest and a total lien on the real estate of $ 1,400,000, of which Calvin's share is given as $ 700,000. Calvin's interest in the realty should *375 have been listed as 900 shares of Metro stock. On January 21, 1973 Calvin executed a second personal financial statement which listed a one-third ownership interest of 258 acres located at "State Bridge." The market value and mortgage attributable to this one-third interest were given as $ 1,293,500 and $ 566,666, respectively. On January 22, 1973 Charles executed a personal financial statement which listed a two-thirds interest in 260 acres on State Bridge Road. The market value and mortgage attributable to this two-thirds interest were given as $ 2,584,000 and $ 1,133,334, respectively. The State Bridge Road property ("State Bridge" as listed on the second of Calvin's financial statements) was actually the land owned by Metro. At the time Charles and Calvin obtained the $ 300,000 in loans from First Palmetto Bank, Goodwyn had not received his option to purchase one-third of Metro's stock. On October 12, 1972, Metro filed subchapter S election Form 2553 with the Internal Revenue Service. Consenting shareholders were Calvin and McClelland. No other shareholders were listed nor did any others sign the consent. On September 20, 1972, McClelland, on behalf of Metro, filed a petition *376 with the Atlanta-Fulton County Joint Planning Board requesting a rezoning of the land from "AG-1" (Agricultural) to "A" (Apartments). The petition requested zoning for 12 units per acre and proposed a 10-year plan of development for the land. The initial letter of intent called for approximately 3,100 "village-type apartments appropriately and scenicly [sic] arranged." The proposed development was called "Mountain Crest." The Planning Board held a scheduled meeting on October 25, 1972, at which the planning staff suggested a density of approximately 4 units per acre. The Planning Board then referred the matter back to its staff for further work with Metro on the plan. On November 1, 1972, a regular meeting of the Fulton County Board of Commissioners convened. McClelland stated that the only dispute involved in Metro's request was the degree of density proposed for the land. Commissioner Cates (Goodwyn) then asked E.L. Fonts (Planning Director) what the basic objection to Metro's plan was. Fonts responded that the petition called for some 3,000 units, which exceeded the Planning Board's proposal for that area. Commissioner Cates then moved for the petition to be referred back *377 to the Planning Board for further study and his motion was approved. On November 29, 1972, at a regular meeting of the Planning Board, approval was given to rezone the land for 2,802 total units (approximately 10.8 units per acre). Metro's petition, as amended, was approved at a recess meeting of the Board of Commissioners held on December 7, 1972. Commissioner Cates was recorded as not voting on the petition. In the interval between the purchase of the land and its rezoning, petitioners knew that the City of Alpharetta was in the process of obtaining proposals for the annexation of some 1,800 acres of land, including 43 acres of Metro's land. Petitioners felt that annexation by Alpharetta would diminish the land's value (due to city taxes and other assessments). On December 29, 1972, the City of Alpharetta annexed 1,800 acres of land, including 43 acres owned by Metro. The annexed property was then rezoned as follows: (a) Single family residential not to exceed 20 percent. (b) Attached single family residential (duplexes) not to exceed 25 percent. (c) Apartment not to exceed 25 percent. (d) Office, institution and industry not to exceed 25 percent. (e) C-1, C-2 commercial *378 not to exceed 10 percent. Metro did not petition for or consent to the plan of annexation adopted by Alpharetta. However, Calvin had discussed the zoning for the annexed land with the mayor and city councilmen of Alpharetta before the annexation. Prior to December 29, 1972, Metro granted an exclusive right to sell the land to Cates Realty Company, Inc. Cates Realty Company was wholly owned by Goodwyn. On December 29, 1972, Calvin and Charles obtained a $ 35,000 loan from the Fulton Exchange Bank at Alpharetta. On the same day, Calvin deposited the $ 35,000 in his checking account and it was then paid over to Cates Realty. Cates Realty reported this $ 35,000 on its 1972 corporate income tax return as an advance commission. On February 28, 1973, a special meeting of the Board of Directors of Metro (now consisting of Calvin, Joan Thomas and McClelland) was convened. At this meeting the Board authorized Calvin to sell the 258.477 acres. The Board also appointed Charles "Assistant Secretary of the Corporation" for the sole purpose of assisting Calvin in effectuating a sale. Because the land was Metro's sole asset, the Board also adopted a plan of liquidation under section 337 of the Internal Revenue Code *379 and authorized Metro to dissolve under the laws of the State of Georgia and surrender its corporate charter. Goodwyn sought purchasers of the land and on March 14, 1973, Metro entered into a contract to sell the land to Larry Morris (hereinafter sometimes referred to as Morris) and Great Southern Enterprises, Inc. The contract price was $ 11,500 per acre, or a total price of $ 2,972,485.50. The terms of the sale required $ 10,000 earnest money (paid to Cates Realty) and the remainder in cash at closing, which was to be 90 days after acceptance of the contract. The broker's commission, payable to Cates Realty Company, was 10 percent of the purchase price. Metro warranted that it could produce evidence that the property was zoned for 1902 units Multi-Family and 900 units Condominium. The contract was expressly contingent upon Morris & Great Southern obtaining adequate financing. If the purchasers did not notify Metro, in writing, by noon on March 26, 1973, that they were unable to obtain the necessary financing then the contingency would automatically be removed. On March 19, 1973, Calvin, Charles, and Ralph Marler obtained a $ 317,500 loan from First Georgia Bank in Atlanta. *380 As the total proceeds of the loan, a cashier's check for $ 314,325 was issued, payable jointly to Calvin, Charles, and Marler. The loan was secured by a deed for the land and was due in 90 days. The cashier's check was deposited in the First Palmetto Bank in full settlement of the six $ 50,000 loans made on September 19, 1972. [11] On June 2, 1973, a payment was due on the outstanding mortgage on the land which Metro had assumed. On order to make the payment of $ 51,559.51, Charles and Calvin borrowed $ 50,000 from First Palmetto Bank and loaned $ 600 each to Metro. Payment of this loan from First Palmetto Bank was due 31 days after July 2, 1973. Metro made the payment to the mortgagees on June 6, 1973. [12] *381 On or about June 22, 1973, an addendum to the March 14 contract was entered into. The addendum provided as follows: ADDENDUM TO CONTRACT
This is an Addendum to that certain contract for sale of realty dated March 14, 1973, between METRO "400", INC., a Georgia corporation ("Seller") and GREAT SOUTHERN ENTERPRISES, INC., a Georgia corporation, and LARRY C. MORRIS (hereinafter collectively called "Purchaser"). RECITALS: A. Seller and Purchaser have heretofore entered into certain contract for sale of realty for a tract of land described in the attached Exhibit "A", consisting of 258.477 acres, more or less. The Broker on the sale is CATES REALTY CO. B. The parties desire to modify certain of the terms of the aforesaid contract of sale prior to consummation thereof and in consideration of the mutual covenants herein contained and the sum of One Dollar and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Purchaser agree to the following terms and conditions: 1.0 Duane L. Hoover shall be added as a Purchaser under the contract and Great Southern Enterprises, Inc. *382 shall be deleted. 2.0 Purchaser shall assume Seller's liability for the commission due Goodwyn Cates d/b/a Cates Realty Co. ("Cates") to the extent of $ 200,000.00, the balance of said commission being payable by the Seller. Accordingly, the sum of $ 200,000.00 shall be deducted from the purchase price due the Seller from the Purchaser at the closing. 3.0 Purchaser and Cates agree that the $ 200,000.00 commission due Cates which is being assumed by Purchaser shall be payable as follows: 3.01 Purchaser shall deliver their non-negotiable, non-transferable and non-assignable promissory obligation to Cates Realty Co. in the amount of $ 200,000.00. Nothing herein shall preclude Cates' estate from collecting or receiving payment on said obligation if Cates dies while the said obligation is outstanding. This sum of $ 200,000.00 shall accrue interest at the rate of nine (9%) percent per annum on the declining balance until paid in full. 3.02 The aforesaid promissory obligation shall be secured by a second Deed to Secure Debt on the property being purchased under the aforesaid contract of sale. However, Cates agrees that said second Security Deed shall contain a subordination clause which *383 will allow Purchaser to subordinate said Security Deed to any bona fide construction loan, permanent financing or other loan required for the development of the real estate subject to the aforesaid contract of sale. 3.03 Cates agrees that if Purchaser desires and effectuates a contract to sell the aofresaid real estate, that Cates will accept substitute collateral in place of the aforesaid second Security Deed, said replacement or substitute collateral to have a value of at least the amount of the then unpaid portion of the promissory obligation. Notwithstanding the foregoing, Cates, upon the subsequent sale of the aforesaid realty subject to this contract of sale, shall have the right to demand payment in full at such time and in lieu of accepting substitute collateral. 3.04 The promissory obligation to be given Cates by Purchaser shall provide for eight (8) equal principal annual installment payments beginning January 15, 1974, of $ 25,000.00 plus accrued interest until the same is paid. The promissory obligation shall specifically provide that Purchasers cannot accelerate the payment nor otherwise anticipate payments of principal or interest. 3.05 As additional consideration *384 for Purchaser agreeing to assume the liability for $ 200,000.00 to Cates, Purchaser agrees to purchase the outstanding options vested in Goodwin [sic] Cates and Charles Cates for their respective one-third (1/3) interest each in Metro 400, Inc., a Georgia corporation, provided, however, that Purchaser agrees that said option shall thereafter be void and of no further force and effect and that the same may be cancelled on the books and records of Metro 400, Inc. The value of said options as of the date of this Agreement is agreed to be $ 566,643.26, each [sic]. 3.06 The parties agree that the closing of the aforesaid contract of sale shall be extended to and including June 27, 1973, with an anticipated closing on June 26, 1973, at 3:00 P.M., in the office of Larry C. Morris, 6685 Peachtree Industrial Boulevard, Atlanta, Georgia. 4.0 Except to the extent otherwise modified herein, the original contract dated March 14, 1973, between Seller, Cates and the Purchaser is hereby ratified and confirmed. On June 26, 1973, the land was sold. On that date Charles and Goodwyn each received $ 283,321.63 from Hoover and Morris for their unexercised options. Payment was made for these options *385 in order for the purchasers to remove what they felt were liens on the land. The proceeds of the sale were used, in part, to pay the following loans: First Mortgage (assumed by Metro 400)
$ 159,322.70
R. Randall Rollins
245,412.45
G. W. Rollins
245,412.45
Henry B. Tippie
245,412.45
Earl F. Geiger
245,412.45
W. Falk, III
245,412.45
First Georgia Bank (Principal
325,424.28
$ 317,500, Interest $ 7,924.28)
Calvin Thomas
20,474.47
Charles Cates
20,474.47
Income Properties, Inc.
15,933.00
Fulton Exchange Bank (Principal
35,787.50
$ 35,000, Interest $ 787.50)
First Palmetto Bank (Principal
50,538.89
$ 50,000, Interest $ 538.89)
$ 1,855,017.56 The balance of the 10 percent broker's commission to Cates Realty ($ 297,248.55) was made by a cash payment of $ 52,248.55 and the $ 200,000 note described in the June 22 Addendum to Contract. [13] A check for $ 283,321.63 was made to Metro for the balance of the purchase price. On July 17, 1973, Metro filed a corporate dissolution notice (Form 966) with the Internal Revenue Service. Metro *386 paid Georgia income tax of $ 8,466 and, on June 30, 1973, distributed its remaining assets ($ 273,082 in cash) to Calvin for his 900 shares of Metro stock. [14]
Cates Realty Company, Inc. liquidated on May 31, 1973. As the sole shareholder of Cates Realty, Goodwyn was entitled to the broker's commission from the sale of the land. Goodwyn continued to operate Cates Realty as a proprietorship and received the $ 200,000 note from Morris and Hoover when the sale was closed. Goodwyn eventually sued Morris and Hoover for his broker's commission. Goodwyn received $ 50,000 as a partial settlement since filing suit and there remains over $ 100,000 due and owing. On his 1973 return, Calvin reported a long-term capital gain from his Metro stock of $ 272,582 ($ 273,082 amount realized less $ 500.00 adjusted basis). Charles and Goodwyn each reported long-term capital gain of $ 283,322 from the sale of their options. Additionally, Goodwyn reported a long-term capital gain of $ 10,529 from the liquidation of Cates Realty Company, Inc. On its Form 1120S for the taxable year beginning September 21, 1972 and *387 ending June 30, 1973, Metro reported a loss of $ 8,446 (due to Georgia income tax). By letters of deficiency dated September 7, 1977 (to Calvin), September 15, 1977 (to Goodwyn), and September 7, 1977 (to Charles), respondent determined that Metro did not qualify as an electing small business corporation and was a collapsible corporation, as defined in section 341(b). Respondent computed a corporate tax liability of $ 396,567.52, based on an increase of $ 848,170 taxable income, and determined that petitioners were each liable, as transferees of Metro, for $ 281,528. [15]
By letter dated October 7, 1977, respondent determined that petitioner Goodwyn Cates received ordinary income from the disposition of his interest in Metro and that Goodwyn Cates d/b/a Cates Realty Company received $ 200,000 in commissions from the sale of the land. By letter dated October 26, 1977, respondent determined that petitioner Calvin Thomas received ordinary income from the liquidation of Metro. By letter dated November 3, 1977, respondent determined that petitioner *388 Charles O. Cates, Jr., received ordinary income from the disposition of his interest in Metro. [16]
ISSUES (6), (7), AND (8)
Goodwyn claimed the following deductions for 1973, 1974 and 1975: Year
Item
1973
1974
1975
Automobile depreciation
$ 278.00
$ 1,666.00
$ 1,666.00
Automobile business
3,106.00
3,183.00
3,357.00
expense
Business loss on
rental property
4,331.00
Respondent allowed the following amounts: Year
Item
1973
1974
1975
Automobile depreciation
$ 208.50
$ 1,249.50
$ 1,249.50
Automobile Business
Expense
$ 2,461.95
$ 2,387.25
$ 2,517.75
Business Loss on
Rental Property
$ 3,023.00
Respondent determined that Goodwyn was liable for the addition to tax under section 6653(a) for 1973 in the amount of $ 11,475.28. During 1973 Goodwyn and Wynelle J. Cates experienced domestic problems. On or about May 1, 1973, Goodwyn purchased a condominium in Atlanta and lived there *389 until the problems subsided (approximately 2 or 3 weeks). Goodwyn never advertised the condominium for rent because the condominium agreement prohibited renting. The condominium was sold in 1976. Goodwyn deducted $ 4,331 for the following expenses in 1973: Real Estate Taxes
$ 931.00
Interest
2,092.00
Maintenance
469.00
Depreciation
839.00
Total
$ 4,331.00
Respondent disallowed the deductions for maintenance and depreciation, totalling $ 1,308. Peter J. Troy, a Certified Public Accountant (who also worked for Metro on the 1973 sale of the land to Morris and Hoover), prepared Goodwyn's 1973 return. ISSUES (9) AND (10)
On his 1973 return, Calvin claimed an interest deduction of $ 5,307. Respondent allowed $ 4,519 in interest expense for 1973. No evidence was presented at trial on this point. Respondent also determined that Calvin received $ 1,760 in unreported income from John C. Roger in 1973. During 1973 Calvin was involved with a youth football program. John C. Roger brought a group of children to the Atlanta area. Calvin advanced $ 1,760 to Roger because the suppliers at a banquet would not accept Roger's personal check. The $ 1,760 check from Roger was in reimbursement for Calvin's *390 advancement of these funds. ISSUES (11), (12), AND (13)
For the taxable year 1973, petitioner Charles O. Cates, Jr. claimed an automobile and truck business expense of $ 5,370 and an additional truck business expense of $ 960. Respondent determined that Charles was entitled to automobile and truck business expenses of $ 5,205 and an additional truck business expense of $ 468. Respondent also determined that on or about March 22, 1973, Charles deposited $ 5,704.66 of unreported taxable income in one of his banking accounts. Respondent determined that Charles was liable for the addition to tax under section 6653(a) in the amount of $ 5,429.37. The additional truck business expense of $ 960 was for a 1960 Chevrolet used on a farm in North Fulton County. Charles' bookkeeper determined the truck's business use to be 8,000 miles in 1973 and deducted 12 cents per mile. Respondent allowed 3,900 miles at 12 cents per mile. Charles introduced no evidence concerning respondent's disallowance of $ 165 of the $ 5,370 in automobile and truck business expense. Charles could not identify the March 22, 1973, deposit of $ 5,705.66 nor could he obtain from his bank a copy of the check. Peter *391 J. Troy, the same Certified Public Accountant who prepared Goowyn's 1973 return, prepared Charles' 1973 return. OPINION ISSUE (1)
Petitioners contend that Metro was entitled to the nonrecognition of gain, pursuant to section 337(a), [17] from the sale of the land to Morris and Hoover. Respondent, on the other hand, argues that Metro was a collapsible corporation as defined in section 341(b) [18] *392 and thus must recognize such gain by reason of section 337(c)(1)(A). [19] In early 1972 petitioners agreed to purchase a desirable parcel of undeveloped land located in Alpharetta, Georgia (approximately 12 to 15 miles outside of Atlanta). Petitioners recognized that if the land, which theretofore had *393 been zoned solely for agricultural use, could be rezoned for apartments and/or condominiums then petitioners could obtain a large profit on its resale. On May 23, 1972, Calvin entered into a contract to purchase the land. Metro was incorporated on July 28, 1972, to complete the purchase. On September 21, 1972, the contract was closed in the name of Metro. Financing of the purchase was made entirely by short-term loans. An attempt was then made to rezone the land for multiple family use. Metro's application for rezoning proposed the development of the land over a 10-year period. Following considerable negotiations over the degree of density for the land, Metro's application was approved by the Fulton County Board of Commissioners on December 7, 1972. The City of Alpharetta annexed 43 acres of the land on December 29, 1972. Metro granted an exclusive right to sell the land to Cates Realty Company, Inc. (wholly-owned by Goodwyn). Charles was appointed Assistant Secretary of Metro to effectuate a sale of land and a plan of liquidation was adopted. Goodwyn, as broker, actively sought out purchasers for the property. In March 1973 a contract of sale was made, contingent upon *394 the purchasers obtaining adequate financing. The purchaser of the land agreed to purchase the interests in Metro of Goodwyn and Charles as well. On June 26, 1973, the sale was closed and the balance of the proceeds, after payment of the debts incurred in the purchase of the land by Metro, was distributed to Calvin. The distribution to Calvin occurred on June 30, 1973, and was in complete liquidation of Metro. Respondent's determination that Metro was a collapsible corporation as defined is based on two grounds. Respondent argues that the corporation was formed or availed of principally for (1) the purchase of property described in section 341(b)(3)(B) [20] *395 , or (2) the construction of property, with a view to a distribution to its shareholders before the realization by Metro of a substantial part of the taxable income to be derived from the property and the realization by its shareholders of gain attributable to such property. Petitioners argue that Metro's activities with respect to the land did not constitute "construction" and that the land was purchased and held solely as an investment by the corporation. [21] *396 Respondent's first contention is that Metro was formed or availed of principally for the purchase of property held primarily for sale to customers in the ordinary course of its trade or business, with the requisite view under section 341(b). Respondent relies on Van Heusden v. Commissioner, 44 T.C. 491 (1965), affd. 369 F.2d 119 (5th Cir. 1966), in support of this argument. Petitioners argue that the property was purchased and held as an investment and thus Metro held only a capital asset, which would not be considered a section 341 asset, citing Howell v. Commissioner, 57 T.C. 546 (1972) and Cohen v. Commissioner, 39 T.C. 886 (1963). In Van Heusden, petitioner contracted to purchase a tract of unimproved real estate. The contract was signed on September 3, 1957. About 3 weeks after the contract was signed, a realty salesman entered into negotiations, with the taxpayer's knowledge and approval, for the sale of the tract. When negotiations reached *397 a satisfactory stage the taxpayer, after consulting with real estate counsel and tax counsel, organized a corporation to which the contract was assigned. The corporation was organized on October 11, 1957, and the assignment also took place on that date. The corporation then (on October 11, 1957) entered into two contracts for the sale of the land. Closing was set for some time between May 1 and May 15, 1958. All of this action was taken in contemplation of the liquidation of the corporation after its sale of the land. On November 15, 1957, the corporation's board authorized the purchase. On May 2, 1958, the board adopted a plan of liquidation including the distribution of its post-sale assets to its shareholders (petitioner and his father). The sale was closed on May 16, 1958, and the corporation was completely liquidated by the end of 1958. The only assets held by the corporation were the unimproved land and a bank account. The issue posed in Van Heusden was whether the petitioner was liable as a transferee if the corporation was collapsible as defined and thus not entitled to section 337's non-recognition provisions. Respondent's determination there rested upon the application *398 of section 341(b)(3)(B) to the unimproved land. Respondent in the present case states that the factual situation in Van Heusden is similar to the present facts. In deciding that the corporation in Van Heusden was collapsible under the "purchase" provision of section 341(b), this Court set forth three requirements agreed to by the parties therein. The corporation must be (1) formed or availed of principally for the purchase of property, (2) which is held by the corporation primarily for sale to customers in the ordinary course of its trade or business (3) with a view to a distribution to its shareholders before the realization by the corporation of a substantial part of the taxable income to be derived from the property, 44 T.C. at 497-498. Additionally, section 341(b)(1)(B) requires the "view" to also apply to "the realization by such shareholders of gain attributable to such property." Metro was clearly formed or availed of to purchase the Alpharetta property. After Calvin signed the purchase contract, petitioners consulted McClelland for advice. McClelland advised petitioners to incorporate and take title to the land in the corporate name. The sole reason for Metro's existence *399 was the purchase and resale of the land. The second requirement is that the land be a section 341 asset, i.e., held by Metro primarily for sale to customers in the ordinary course of its trade or business (section 341(b)(3)(B) being the only provision of section 341(b)(3) involved here). It is on this requirement that the parties are in dispute. Petitioners claim that the land was purchased solely as an investment. Respondent, on the other hand, emphasizes a number of factors in contending that the land was not a capital asset. In Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52 (1955), the Supreme Court stated: But the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. Burnet v. Harmel, 287 U.S. 103, 108. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from *400 a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." Burnet v. Harmel, 287 U.S. at 106.Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term "capital asset" in § 117. The capital gain provisions are intended to distinguish between the gains obtained through the normal operation of a business and the gain obtained from the passive appreciation in value which accrues to an asset. The Supreme Court recognized this distinction when it stated, in Malat v. Riddell, 383 U.S. 569, 572 (1966): The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * and "the realization of appreciation in value accrued over a substantial period of time" on the other.
The determination of whether an asset is held primarily for sale to customers in the ordinary course of one's *401 trade or business is ultimately factual. Keeping in mind the strict construction to be given the definition of capital asset and the purpose of the statute we must endeavor to determine, under these particular facts, whether Metro's sole asset was a capital asset. We hold that it was. The most commonly relied upon factors in deciding whether an asset is a capital asset or not are the following: (1) the purpose for which the asset was acquired, (2) the frequency, continuity, and size of the sales, (3) the activities of the seller in the inprovement and disposition of the property, (4) the extent of improvements made to the property, (5) the proximity of the sale to the purchase of the property, and (6) the purpose for which the property was held during the taxable year(s). Howell v. Commissioner, supra; Pointer v. Commissioner, 48 T.C. 906 (1967), affd. 419 F.2d 213 (9th Cir. 1969); Bauschard v. Commissioner, 31 T.C. 910 (1959), affd. 279 F.2d 115 (6th Cir. 1960). Depending upon the particular factual situation involved, certain factors may bear more heavily on the determination to be made and other factors not enumerated above may be quite relevant. [22] *402 In United States v. Winthrop, 417 F.2d 905 (5th Cir. 1969), the Fifth Circuit, to which appeal would lie in the instant case, enumerated the following factors: (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. 417 F.2d at 909-910. In Biedenharn Realty Co. v. United States, 526 F.2d 409 (5th Cir. 1976), the Fifth *403 Circuit emphasized that the frequency and substantiality of the taxpayer's sales was the most important of the "Winthrop factors." 526 F.2d at 416. One of the elements of section 1221(1) is that the taxpayer be engaged in a trade or business. Since the parties filed their briefs herein we have decided the case of Buono v. Commissioner, 74 T.C. 187 (1980). The facts in Buono are remarkably similar to the instant facts. The petitioners in Buono were the shareholders of a subchapter S corporation which acquired an approximately 130-acre tract of farm land in 1968 from its shareholders. The petitioners intended to have a subdivision plan for the property approved, which would significantly enhance the property's marketability and value, and then sell the entire tract intact. The anticipated holding period of the tract was 1 and 1/2 years. However, due to a dispute over the size of the individual lots on the proposed subdivision plan the plan was not approved until November of 1972, after litigation over the denial of the plan. In November 1972 a contract to sell a 39.5 acre tract [23] was executed and in January 1973 the sale was consummated. The corporation did not engage in any advertising, *404 solicitation, sales promotion or other marketing techniques. The sale in issue was occasioned from an informal discussion between a developer and one of the petitioners. In holding that section 1221(1) was inapplicable to the sale of the 39.5 acre tract in 1973 and thus that the petitioners were entitled to capital gain treatment, we first held that the property was "held for sale to customers." Although the petitioners argued that the corporation acquired and held the land for investment purposes, we found that the corporation acquired and held the land in order to have the subdivision plan approved and then immediately sell the land. Buono went on, however, to analyze whether the corporation's activities rose to the level of a trade or business. The most important objective factor in the context of Buono was the lack of frequent and substantial sales activity. The transaction in Buono was found to be isolated *405 and the obtainment of an approved subdivision plan in order to make the property more marketable and selling a major parcel as a single tract did not, when coupled with the disposition of the highway and shopping center parcels, place the corporation in a trade or business. The crucial element in Buono was the petitioner's intent to sell the unimproved property as an entire tract. We also rejected respondent's contention in Buono that capital gain treatment should be denied because the petitioner's activities, and not market appreciation, contributed to the bulk of the gain from the property. The focus of the inquiry is whether the taxpayer's activities rise to the level of a trade or business and not solely whether the taxpayer's efforts or market forces caused the appreciation. [24] The only factual differences that we can discern between the instant case and Buono are that in Buono it took much longer for the subdivision plan to be approved (and *406 hence for the sale to take place), that the offer for sale was unsolicited, and that in Buono additional dispositions of parcels of the realty were made. While the holding period of the property in issue is relevant to our determination, our decision in Buono emphasized the isolated nature of the sale. Had the delays in Buono not occurred and the land been sold in due course, our decision would not have differed. Although Goodwyn, as Metro's agent, solicited the purchase of the land, that activity was the only sale activity by or on behalf of Metro. The fact that Metro's agent solicited the sale does not compel a finding that Metro was engaged in a trade or business. Indeed, Metro's activities herein are even fewer than those of the corporation in Buono. Based upon the solitary nature of the sale herein and our decision in Buono, we find that Metro did not sell the property in the ordinary course of a trade or business, [25] and thus was not a collapsible corporation under the "purchase" provision of section 341 (b)(1). [26] *408 *409 *410 Because we find that the land was not sold in the ordinary course of Metro's trade or business, we need not consider the third test of Van Heusden v. Commissioner, supra. *407 [27] *411 Respondent asserts that Metro's activities with respect to the land constituted "construction," as that word is used in section 341(b)(1), relying on Sproul Realty Co. v. Commissioner, 38 T.C. 844 (1962). Respondent's assertion is based on the proposition that preliminary activities which enhance the value of land are to be considered construction for purposes of section 341(b)(1). Without preliminary activities, respondent argues, there would be no gain (apart from normal market appreciation) from a subsequent sale of the property to which section 341 would apply. Petitioners, on the other hand, maintain that Metro's activities did not constitute construction, citing Cohen v. Commissioner, supra.
In Sproul Realty Co. the petitioner was formed in 1954 for the principal purpose of developing and constructing a shopping center. Petitioner purchased a 14-1/2 acre tract of land, succeeded in rezoning the land from residential to commercial, hired an architect to prepare plans for the shopping center, began *412 negotiations for building permits and performance and maintenance bonds, obtained two tenants and was negotiating with a third and had unsuccessfully attempted to obtain permanent financing for the necessary construction and improvements. Before actual physical construction commenced the petitioner sold the shopping center, contingent upon petitioner's completion of the construction and improvements up to a stipulated maximum amount, for which the buyer would reimburse petitioner. We held that the preliminary activities of the petitioner constituted "construction" within the definition of a collapsible corporation, 38 T.C. at 855-856, citing Farber v. Commissioner, 36 T.C. 1142, 1156 (1961), affd. 312 F.2d 729 (2nd Cir. 1963), cert. denied 374 U.S. 828 (1963) (retention of an architect, application for construction permits, preliminary arrangements for the installation of water and sewer services and street improvements, filing of a bond, deposit for the purchase of materials for improvements, advance payment for utility connections, and applications for financing constituted construction); Sterner v. Commissioner, 32 T.C. 1144, 1149 (1959) (hiring of a mortgage broker and architect *413 and application for mortgage insurance held to be construction); Payne v. Commissioner, 30 T.C. 1044, 1058-1059, (1953), affd. 268 F.2d 617 (5th Cir. 1959) (subdivision of the property, installation of streets, water and sewer facilities, obtaining approval of the municipality, and securing financing constituted construction); and Abbott v. Commissioner, 28 T.C. 795 (1957); affd. 258 F.2d 537 (3rd Cir. 1958) (subdivision of the property, installation of streets and utilities, obtaining the approval of the municipality, and securing financing held to be construction). In Cohen v. Commissioner, supra, a corporation (DOM) was organized in September of 1955 to purchase a tract of unimproved land. [28] The property was zoned for agricultural use when purchased by DOM. Prior owners of the property had commenced efforts to have water and sewer services made available to the area and DOM continued those efforts. A contour map was prepared by a surveyor and a preliminary plot for development was obtained by DOM. A petition was filed by DOM to rezone the property as residential. Due to the announcements by two companies of the planned construction of two large manufacturing plants near *414 the DOM property, DOM received an unsolicited offer for the purchase of either the property or petitioners' DOM stock. Petitioners chose to sell their DOM stock. After the stock sale, which occurred on May 16, 1956, a first filing plot was obtained and the property was rezoned for residential purposes. No physical improvements were made on the land while the petitioners owned their DOM stock, although petitioners brought a water main to the property, at no cost to petitioners or the buyer, as a condition of the sales contract. We held that the limited activities of DOM while the petitioners held the stock did not constitute "construction," even within the broad meaning of that term as used in section 341 (b)(1) and that DOM was thus not a collapsible corporation, 39 T.C. at 892. It is readily apparent that the activities of petitioners and Metro with regard to the property were on a far smaller scale than the activities which occurred in Sproul Realty Co. and *415 the cases cited therein. Metro merely obtained a site plan for the property for its use in the rezoning application. Indeed, the actions of Metro appear to be of no greater magnitude than those which occurred in Cohen, although in the instant case rezoning of the property was completed prior to the sale of the land while in Cohen rezoning occurred after the stock sale in question. The difference in degree among the instant activities and those in Sproul Realty Co., et al., is sufficient to hold that Metro did not engage in "construction," even under a broad interpretation of that term. Respondent points out that the rezoning of the land and normal market pressures caused the appreciation in the land's value and that the efforts of petitioners and Metro on behalf of rezoning thus constituted construction. While language in some of our prior opinions could be read to countenance respondent's premise, Sterner v. Commissioner, supra, at 1149; Abbott v. Commissioner, supra, at 805-806, the enhancement in value of property accruing from the efforts of the corporation holding such property is more relevant in the determination of whether gain is attributable to the property's construction *416 than whether "construction" in fact occurred. Mintz v. Commissioner, 32 T.C. 723, 742 (1959), affd. 284 F.2d 554 (2nd Cir. 1960); August v. Commissioner, 30 T.C. 969, 987 (1958), affd. 267 F.2d 829 (3rd Cir. 1959).
Accordingly, we hold that Metro was not a collapsible corporation as defined in section 341(b)(1) and thus was not prohibited by section 337 (c)(1)(A) from the benefits of section 337(a) upon the sale of the land. because Metro is entitled to the nonrecognition of gain provided by section 337, we do not reach the question of whether Metro properly elected to be treated as a subchapter S corporation, or whether petitioners are liable as transferees for the corporate income tax due from the sale of the property. [29] *417 Respondent next contends that Charles and Goodwyn received short-term capital gain from the sale of their options to Morris and Hoover. [30] *418 *419 Respondent's argument is based upon his premise that the options dated September 20, 1972 were actually executed at some time subsequent to December 28, 1972. Charles and Goodwyn argue that their options were executed on September 20, 1972 and therefore that the sale of the options resulted in long-term capital gain. On this issue we hold for respondent. Section 1222(3), as in effect in 1973, provided: The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income. Charles and Goodwyn sold their options on June 26, 1973. The holding period of a capital asset [31] is determined by excluding its date of acquisition and including its date of disposition. Fogel v. Commissioner, 203 F.2d 347, 349 (5th Cir. 1953), affirming a Memorandum Opinion of this Court; Weir v. Commissioner, 10 T.C. 996, 1000-1001 (1948), affd. per curiam 173 F.2d 222 (3rd Cir. 1949). Thus, in order for long-term capital gain treatment to be accorded to the sale of the options, such options must have been acquired prior to December 26, 1972. The burden rests on Charles and Goodwyn to show that the options were acquired prior to that date. Barran v. Commissioner, 39 T.C. 515, 533 (1962), *420 affd., revd. and remanded on other issues, 334 F.2d 58 (5th Cir. 1964). The evidence adduced by Charles and Goodwyn as to the date of issuance of the options is, at best, equivocal. None of the witnesses could recall the dates the various draft options were executed and they could only conjecture that the options were granted in August or September of 1972, sometime before closing on the land by Metro. Only the options dated September 20, 1972 were dated, although the draft options bore the dates "the     day of    , 1972." Several reasons exist which lead us to our holding that the options were not actually issued on September 20, 1972. First, the options were each for 900 shares or one-third of Metro's stock. However, on September 20, 1972 McClelland also held 300 shares of Metro's stock as payment for his legal services. McClelland's 300 shares were not relinquished until around December of 1972. Thus, as of September 20, 1972, unless petitioners were not cognizant of the shares held by McClelland, 900 shares would not have been represented in the options as one-third *421 of Metro's stock. In fact, such amount would have represented one-third of Metro only after McClelland surrendered his 300 shares, which occurred sometime in late December of 1972. See footnote 9. Second, a close comparison of the draft options with the personal financial statements of Calvin and Charles reveals that the options most likely were executed sometime after December 28, 1972. The first draft of the options granted an option to Charles to purchase one-half of Metro's stock. On Calvin's personal financial statement of December 28, 1972 he listed a 50 percent ownership interest in Metro's realty. The option for one-half of Metro's stock was later altered to grant Charles an option for two-thirds of Metro's stock. Calvin's personal financial statement of January 21, 1973 lists a one-third ownership of Metro's realty, and Charles' personal financial statement of January 22, 1973 lists a two-thirds ownership of Metro's realty. [32] Thus, the alteration in the draftoption was apparently made sometime after December 28, 1972. Lastly, Goodwyn executed a demand note for $ 13,649.64 to Calvin and Charles, which amount represented his one-third share of all loan repayments by Metro *422 to Calvin and Charles. This note was also dated September 20, 1972. However, Calvin and Charles each made loans to Metro prior to September 20, 1972 of only $ 16,821.85. Therefore, the demand note dated September 20, 1972 somehow stated the exact amount ($ 40,948.94) that had been repaid by Metro to Calvin and Charles, including the $ 600 loans of June 2, 1973. Based on these facts we find that the options were not acquired by Charles and Goodwyn prior to December 26, 1972 and thus that the gain realized from the sale of the options is short-term capital gain. Accordingly, we need not consider whether Charles and Goodwyn received the options in return for services rendered. ISSUE (5)
Respondent argues that in the liquidation of Cates Realty Company, Goodwyn received a contractual right to a broker's commission from the sale of the land. Respondent values this right at $ 252,248 (see fn. *423 13). Alternatively, respondent contends that Goodwyn was in constructive receipt of the $ 200,000 evidenced by the note from Hoover and Morris. Petitioiner Goodwyn Cates argues that the contract of sale dated March 14, 1973 "fell through" and that the actual contract of sale was the June 22, 1973, document which was entitled "Addendum to Contract." Goodwyn also argues that the $ 200,000 note had no ascertainable fair market value and was merely a promise to pay subject to substantial limitations and restrictions. Petitioner asserts that the burden of proof with respect to respondent's first contention is on respondent. We agree. Respondent did not raise this theory until opening argument. The question of whether Goodwyn received the contractual right to the commission and its value, if any, is a new matter and thus the burden of proof is on respondent. Rule 142(a), Tax Court Rules of Practice and Procedure.
Cates Realty Company was granted an exclusive right to sell the land. On March 14, 1973, a contract to sell to Morris and Great Southern was executed. The contract was contingent upon the purchasers obtaining financing. If the purchasers did not notify Metro of their failure *424 to obtain financing by noon of March 26, 1973, then the contingency would lapse. No such notice was given. The broker's commission was payable by Metro, the seller. About June 22, 1973, a document entitled "Addendum to Contract" (see pp. 20-22) was executed. Basically this document substituted Hoover for Great Southern and obligated the purchasers, rather than the sellers, to pay the bulk of the broker's commission. Payment of the $ 252,248 remaining commission was to be as follows: $ 52,248 on closing by the sellers and $ 200,000 by the purchasers' note secured by a second mortgage and payable in eight equal installments beginning in January 1974. The note was nonnegotiable, nonassignable, and nontransferable and bore 9 percent per annum interest. On June 26, 1973, the land was sold. Goodwyn later sued to collect on the note and received approximately $ 50,000. On May 31, 1973, before the execution of the Addendum, Cates Realty liquidated. Goodwyn Cates was the sole shareholder of Cates Realty.Thus, respondent argues that Goodwyn received a contract right worth $ 252,248 in Cates Realty's liquidation. Goodwyn argues that the March 14 contract fell through and that the Addendum *425 to Contract executed about June 22 was the actual contract of sale. Respondent maintains that the Addendum to Contract merely amends the March 14 contract. Respondent argues that the contract provided only 12 days for the purchasers to obtain financing for a multi-million dollar transaction. Respondent concludes that the financing must have been available on March 14 and all that remained for Cates Realty to do was to close the sale and collect its commission. Lastly, respondent argues that it is incredible that a new contract could have been executed on June 22, 1973, and the sale closed on June 26. We agree with respondent.
The March 14 contract was expressly contingent upon purchasers' notification of inability to obtain financing. The deadline passed without such notification and thus the contingency lapsed. The Addendum to Contract makes several references to the March 14 contract. For example, in the preamble: "This is an addendum to that certain contract for sale of realty dated March 14, 1973 * * *." Paragraph A states: "Seller and Purchaser have heretofore entered into certain contract [sic] for sale of realty * * *." Paragraph B states: "The parties desire to modify *426 certain of the terms of the aforesaid contract of sale prior to consummation thereof * * *." Lastly, paragraph B, clause 4.0 states: Except to the extent otherwise modified herein, the original contract dated March 14, 1973, between Seller, Cates and the Purchaser is hereby ratified and confirmed. Thus, it is readily apparent that the "Addendum to Contract" was merely a modification of the contract of March 14, 1973. Goodwyn contends that the "Addendum to Contract" was executed in a shorter form than a complete contract at the suggestion of the purchasers' counsel, Fred L. Somers, Jr. Somers testified regarding the promissory note for the commission but did not otherwise testify as to the execution of the Addendum to Contract. Certainly if the Addendum to Contract was intended as a full contract of sale and not a modification, it would not have repeatedly made reference to an earlier contract as if the earlier contract was still in effect and was merely being modified.
Thus, as of May 31, 1973, Cates Realty had a contract right to its commission from the sale of the land. The commission was then payable by Metro. Metro was to receive the full sale price at closing and there was *427 no reason to doubt whether Cates Realty would receive its entire commission at that time, particularly when one considers Goodwyn's close connection with Metro. We find that the contract right was thus worth $ 252,248 at the time of Cates Realty's liquidation.Because of our holding on this issue we need not discuss respondent's constructive receipt contention. ISSUES (6), (7) and (8)
Goodwyn introduced no evidence relevant to the auto depreciation and business expenses for 1973, 1974, and 1975 disallowed by respondent, nor is the issue discussed on brief. Under Rule 142(a), Tax Court Rules of Practice and Procedure, Goodwyn bears the burden of proof on this point. We can only assume that Goodwyn has abandoned this issue and accordingly we must hold for respondent. Respondent disallowed under section 183 deductions for maintenance ($ 469) and depreciation ($ 839) of a condominium that Goodwyn resided in for a portion of 1973. The condominium was never rented or advertised for rental because the condominium agreement prohibited rentals. Goodwyn argues that these expenses are deductible under section 212 because he acquired the condominium as an investment. Section 183(a) limits *428 the deductions allowable that are attributable to activities not engaged in for profit. Under section 183(b) such deductions are limited to deductions allowable without regard to profit and other deductions not in excess of the gross income derived from such activity. Finally, for purposes of section 183, section 183(c) defines "activity not engaged in profit" as any activity other than those with respect to which deductions are allowable under section 162 or paragraph (1) or (2) of section 212. Section 167(a)(2) allows as a depreciation deduction a reasonable allowance for the exhaustion and wear and tear of property held for the production of income. Similarly, section 212(2) allows as deductions all ordinary and necessary expenses paid or incurred for the management, conservation or maintenance of property held for the production of income. Section 212(1) allows as deductions all ordinary and necessary expenses paid for the production or collection of income. Goodwyn has not asserted that the condominium was property used in a trade or business. Deductibility under sections 167(a)(2) and 212 (2) for depreciation and maintenance of the condominium thus depends upon whether *429 Goodwyn held it for the production of income. We find he did not. Generally, this question arises when an individual has abandoned his or her residence and seeks deductions for costs incurred (including depreciation) prior to its sale.Deductibility of such costs depends upon whether the taxpayer has shown that a conversion of the property for the production of income has occurred. In Newcombe v. Commissioner, 54 T.C. 1298 (1970), we looked to whether the taxpayer seeking the deductions was merely trying to recoup the basis of the property or whether the property was held for post-conversion appreciation. Respondent's regulations state that "income" for the purpose of section 212 includes income which the taxpayer may realize in a subsequent taxable year, section 1.212-1(b), Income Tax Regulations. Neither party suggests that "income" as used in section 167(a)(2), should be defined differently than under section 212. Goodwyn purchased the condominium and lived in it only temporarily (two or three weeks). The condominium agreement prohibited rentals. However, after moving out of the condominium Goodwyn advertised its sale. The condominium was eventually sold in 1976. The record *430 does not indicate whether this sale was at a profit, nor does it indicate the fair market value of the condominium when Goodwyn moved out. Petitioner bears the burden of proof on this issue and petitioner has failed to establish that he held the condominium for post-conversion appreciation, or even that any post-conversion appreciation existed. On the scant record before us we cannot hold for petitioner. Lastly, respondent determined that a portion of Goodwyn's 1973 underpayment was due to negligence or intentional disregard of rules and regulations. Accordingly, respondent determined that 5 percent addition to tax pursuant to section 6653(a) was applicable. At trial, Goodwyn stated that he felt that he was conscientious with regard to the claimed depreciation and maintenance deductions for the condominium and that these deductions were discussed with a certified public accountant. Goodwyn introduced no evidence relevant to his auto depreciation and expenses. Goodwyn has not shown that his claimed auto depreciation and expenses were not the result of negligence or intentional disregard of the rules and regulations. Because "any part" of the 1973 underpayment is due to negligence *431 or intentional disregard of rules and regulations we have no alternative other than to sustain respondent's determination. ISSUE (9) AND (10)
Respondent allowed $ 4,519 of Calvin's claimed $ 5,307 interest deduction in 1973. Calvin introduced to evidence at trial and does not discuss this issue on brief. We must thus hold for respondent.
Respondent also determined tha Calvin realized $ 1,760 in unreported income from John C. Rogers in 1973. We have found that the payment from Rogers was reimbursement for funds advanced by Calvin. Therefore the sum was received merely as a repayment for a loan and was not gross income. ISSUES (11), (12), AND (13)
Respondent disallowed a portion of Charles' claimed automobile and truck business expenses for 1973. Charles introduced to evidence relevant to these expenses. Respondent's determination is sustained. Respondent also determined that Charles received $ 5,705 of unreported income in 1973. This sum represented a bank deposit. Charles could not obtain a copy of his deposit receipt nor could he otherwise identify the deposit. Because Charles has failed to met his burden of proof on this issue we hold for respondent. Respondent determined *432 that the section 6653(a) addition to tax was applicable for 1973. Because Charles has produced no satisfactory evidence relevant to his claimed auto and truck expenses and the unreported income and thus has not shown that the deductions and omissions were not the result of negligence or intentional disregard of the rules and regulations, we must sustain respondent. Decisions will be entered for petitioners in Docket Nos. 11998-77, 11999-77, 12000-77. Decisions will be entered under Rule 155 in Docket Nos. 157-78, 831-78, 1140-78. Footnotes
1. Cases of the following petitioners are consolidated herewith: Goodwyn Cates, Transferee of Metro "400" Inc., docket No. 11999-77; Charles O. Cates, Jr., Transferee of Metro "400" Inc., docket No. 12000-77; Goodwyn Cates and Wynelle J. Cates, docket No. 157-78; Calvin A. Thomas and Joan Thomas, docket No. 831-78; Charles O. Cates, Jr., and the Estate of Billie B. Cates, Deceased, Charles O. Cates, Jr., Administrator, docket No. 1140-78.↩
2. All statutory references are to the internal Revenue Code of 1954, as amended.↩
3. The term "option" and "options" are used herein solely for purposes of convenience and are not intended to characterize the instruments for resolution of the issues.↩
4. Calvin and Charles owned a liquor store and have apparently participated together in other business transactions.↩
5. The agreed upon broker's commission of $ 34,118.96 was to be shared equally between Income Properties, Inc. and Falk Realty Company Inc. Terms of payment of the Commission paralleled the terms of payment on the note made to the sellers, i.e., 20 percent down on closing and the balance in 10 equal annual installments bearing interest at 7 percent per annum. In the event Calvin prepaid the note, the broker's commission would also be prepaid.↩
6. On November 10, 1972, Mitchell and Jernigan resigned from the Board. Calvin and Joan Thomas were elected to replace them.↩
7. The participation of Whitlow, Lunsford, Marler, and Alexander was apparently limited to borrowing $ 50,000 each from First Palmetto Bank in order to help petitioners finance the purchase of the land.↩
8. Metro deposited Calvin's payment into a checking account at Citizens and Southern National Bank in Atlanta. The account was opened on October 5, 1972, and the deposit made on October 6, 1972. Calvin, as President of Metro, was authorized to sign on the account for the company. ↩
9. In later December of 1972 McClelland surrendered these shares at the insistence of Goodwyn, who felt that McClelland was being paid too much. McClelland accepted a flat fee for his services instead. This fee was paid on May 24, 1973, apparently by petitioners. Metro's books and checking account do not reflect any payments to McClelland.
10. Goodwyn thus executed demand notes for $ 100,000 and $ 13,649.64 to Calvin and Charles. The $ 100,000 note was for Goodwyn's share of the loans from First Palmetto Bank. The $ 13,649.64 note was for Goodwyn's share of the loans to Metro from Calvin and Charles. The $ 13,649.64 demand note bears a marginal notation stating " 1/3 Cost Expenses, Total $ 40,948.94." The sum of all loans repaid to Calvin and Charles by Metro was $ 40,948.94. How Goodwyn could have known on September 20, 1972 his one-third share of this amount is unclear.
11. On March 19, 1973, Goodwyn issued a new demand note to Calvin and Charles in the amount of $ 105,833 (one-third of $ 317,500). This note replaced the $ 100,000 demand note which was issued by Goodwyn on September 18, 1972. The March 19, 1973, note and the note dated September 20, 1972 (in the amount of $ 13,649.64) were both cancelled on June 26, 1973, after the sale was closed.↩
12. These transactions together with Calvin's $ 500 capital contribution and a $ 2.85 bank service charge, represented the entire activity of Metro's checking account.
13. Cates Realty Company was to receive its commission as follows: ↩
Earnest Money
$ 10,000.00
Dec. 29, 1972 advance
35,000.00
June 26, 1973 payment
52,248.55
Note from Purchasers
200,000.00
$ 297,248.55
14. McClelland had previously surrendered the 300 shares issued to him. See footnote 9.↩
15. Respondent has since conceded that Calvin's transferee liability should be limited to $ 273,082, the amount Calvin received from Metro.↩
16. Respondent has conceded on brief that Calvin correctly treated the gain from the exchange of his Metro stock as long-term capital gain. Respondent has also conceded that should we find Goodwyn and Charles to be "beneficial shareholders" or Metro, then Goodwyn and Charles correctly treated the disposition of their interests as long-term capital gain.↩
17. SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS. (a) General Rule.--If-- (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.↩
18. SEC. 341. COLLAPSIBLE CORPORATIONS. (b) Definitions.-- (1) Collapsible corporation.--For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to-- (A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and (B) the realization by such shareholders of gain attributable to such property. ↩
19. SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS. (c) Limitations.-- (1) Collapsible corporations and liquidations to which section 333 applies.--This section shall not apply to any sale or exchange-- (A) made by a collapsible corporation (as defined in section 341(b)).↩
20. SEC 341. COLLAPSIBLE CORPORATIONS. (b) Definitions.-- (3) Section 341 assets.--For purposes of this section, the term "section 341 assets" means property held for a period of less than 3 years which is-- (B) property held by the corporation primarily for sale to customers in the ordinary course of its trade or business.
21. Section 341(b) limits the application of section 341(a) in purchase contexts solely to purchases of "section 341 assets," i.e., those defined in section 341(b)(3).Petitioners urge that the land was a capital asset and thus not a section 341 asset. Petitioners also argue that "Corporation [sic] which hold only land as an investment are not collapsible under Section 341 because land held as an investment is not a 'Section 341 asset' as defined * * *." Petitioners are in error on this point. While section 341 was enacted to prevent the transmutation of ordinary income into capital gain by use of corporate liquidations or stock sales, the statute does not exclude from its coverage gain which would otherwise have been capital gain. The Supreme Court ruled specifically on this point in Braunstein v. Commissioner, 374 U.S. 65 (1963). The Court stated, "There is nothing in the language or structure of the section [section 117(m) of the 1939 Code] to demand or even justify reading into these provisions the additional requirement that the taxpayer must in fact have been using the corporate form as a device to convert ordinary income into capital gain." 374 U.S. at 70↩.
22. For example, the relative amounts of income received from a taxpayer's regular business and from the property transaction in issue may be significant in certain cases. See Adam v. Commissioner, 60 T.C. 996 (1973); Real Estate Corp. v. Commissioner, 35 T.C. 610 (1961), affd. 301 F.2d 423 (10th Cir. 1962), cert. denied 371 U.S. 882 (1962); Hoover v. Commissioner, 32 T.C. 618↩ (1959).
23. The corporation had agreed, in settlement of the liquidation, to dedicate 70.6 acres to the town. Two and one-half acres had been condemned for a new state highway and the corporation retained another 15 acres for the development of a shopping center, which was later sold.↩
24. In United States v. Winthrop, 417 F.2d 905 (5th Cir. 1969), the Fifth Circuit also rejected the "taxpayer's efforts" argument advanced by the Commissioner as an overly broad interpretation of the Corn Products doctrine, 417 F.2d at 909↩.
25. Although petitioners contend that Metro intended to develop the land after it was rezoned, we find that Metro at all times intended to resell the land immediately thereafter and that Metro's 10-year development plan was proposed merely to obtain residential zoning. The short-term financing obtained by Metro strongly belies petitioners' claim in this respect. ↩
26. The Fifth Circuit has analyzed section 1221(1) in two recent cases, Reese v. Commissioner, 615 F.2d 226 (5th Cir. 1980), affg. T.C. Memo. 1976-275; and Suburban Realty Co. v. United States, 615 F.2d 171 (5th Cir. 1980). In Reese the taxpayer urged that his activities constituted a trade or business so that he should be entitled to an ordinary loss from the disposition of a partially completed building. In holding that the taxpayer was not engaged in the trade or business of building, developing and general contracting, the Court pointed to the isolated, nonrecurring nature of the project. The Court stated: * * * While there may perhaps be extraordinary circumstances in which a taxpayer's devotion of time and resources to a non-recurring venture constitutes a trade or business, [6] a single transaction ordinarily will not constitute a trade or business when the taxpayer enters into the transaction with no expectation of continuing in the field of endeavor. See Commissioner v. Williams, 256 F.2d 152 (1958), aff'd on rehearing, 285 F.2d 582 (5th Cir. 1961); Beach v. Shaughnessy, 126 F. Supp. 771 (N.D.N.Y. 1954); Herwig v. United States, 105 F.Supp. 384, 122 Ct. Cl. 493 (Ct. Cl. 1952). Thus, we have held that a taxpayer who purchased a partially constructed ship, completed the construction and then sold the ship was not engaged in the trade or business of buying, constructing, and selling ships because there was no evidence indicating that any other such projects had been contemplated. Williams, supra at 155. Similarly, here there is no evidence indicating Reese entered into the Addison project with the idea that it would be the first of other such projects by him. * * * [6] Conceivably, a single endeavor could rise to the level of a trade or business where the taxpayer, at the time he entered into it, fully expected the transaction to be but the first of many and was prevented, for one reason or another, from continuing in the business. Such a situation, however, does not exist here. The project was clearly an isolated, non-recurring venture. Reese cannot be considered to be engaged in the trade or business of "building, developing and general contracting" with respect to the venture because there was neither prior or subsequent activity on his part in this field of endeavor, nor an intention to devote his time and effort in the future to activities in this field. Accordingly, we affirm the Tax Court's determination that, with respect to the Addison project, Reese was not engaged in a trade or business within the meaning of section 1221(1). [7]
[7]By affirming the Tax Court's determination that Reese was not engaged in a trade or business under § 1221(1), we affirm by implication the Tax Court's determination that the loss on the Addison project was not a "loss incurred in a trade or business" under § 165(c)(1), but was a "loss incurred in any transaction entered into for profit, though not connected with a trade or business" under § 165(c)(2). Indeed, it is difficult to imagine what type of transaction would fall within § 165(c)(2) were we to adopt taxpayers' position that a single, non-recurring venture entered into without any expectation of continuing in the field of endeavor constitutes a trade or business. [615 F.2d at 230-231] In Suburban Realty Company, the issue was whether certain undeveloped parts of a parcel of land were sold by the taxpayer to customers in the ordinary course of its trade or business. The Court parsed section 1221(1) into three questions (615 F.2d at 178): (1) was taxpayer engaged in a trade or business, and, if so, what business? (2) was taxpayer holding the property primarily for sale in that business? (3) were the sales contemplated by taxpayer "ordinary" in the course of that business? The Court then directed each of the factors of Biedenharn Realty Co. v. United States, 526 F.2d 409 (5th Cir. 1976), and Winthrop to these statutory inquiries. Frequency and substantiality of sales were found to be the most important factors because of their relevance to all three statutory inquiries. In deciding whether the taxpayer in Suburban Realty↩ was engaged in the business of selling real estate the Fifth Circuit emphasized the taxpayer's continuous and substantial sales activities. The absence of sales solicitation or advertising did not compel an opposite conclusion.
27. Respondent also maintains that petitioners have failed to rebut the presumption of collapsibility provided in section 341(b). Because we have decided that the land was not a "section 341" asset, section 341(c) is not applicable herein.
28. Cohen↩ also involved the sale of a second parcel of land by a joint venture. Since our discussion of "construction" in that case only related to the parcel owned by DOM we need not discuss the land sold by the joint venture.
29. Since Metro recognizes no gain from the sale, it is irrelevant, for purposes of determining the transferee liabilities of petitioners, whether or not Metro was a subchapter S corporation. Since there is no corporate income tax upon a subchapter S corporation pursuant to section 1372(a), with the exception of section 1378 (which respondent has not sought to impose), only had we found Metro to be both a collapsible corporation and a non-subchapter S corporation could petitioners possibly have been liable as Metro's transferees.
30. Charles and Goodwyn argue that we cannot consider this argument because it was not set forth in the notices of deficiency issued to them (which asserted that Charles' and Goodwyn's income from the sale of the options was ordinary income either because the options were actually stock in a collapsible corporation or were received in return for services rendered) relying on Markle v. Commissioner, 17 T.C. 1593 (1952). Respondent, in turn, asserts that his determination may be affirmed for reasons other than those assigned in the notice of deficiency, as long as there has been no surprise and substantial detriment to Charles and Goodwyn in the presentation of their cases because of the manner in which the issue raised at trial differed from that raised by the statutory notices and pleadings, citing Estate of Horvath v. Commissioner, 59 T.C. 551 (1973). In Estate of Horvath, respondent's notice of deficiency denied a deduction under section 2053(a)(3) on the ground that the state statute of limitations barred collection of decedent's debt. All the pleadings were directed to the statute of limitations issue. At trial, respondent sought to attack the validity of the debt as a basis for disallowing the deduction.Because of the state of the pleadings and the different nature of the evidence relevant to the validity of the debt we refused to consider such argument. In the present case, however, Charles' and Goodwyn's petitions alleged that the options were capital assets held for more than 6 months, which allegations were denied by respondent. (Charles and Goodwyn additionally alleged, of course, that they were not beneficial shareholders of a collapsible corporation nor did they receive the options as payment for services rendered). Furthermore, the parties introduced numerous joint exhibits into evidence concerning the date of issuance of the options. We can detect no surprise and substantial disadvantage to Charles and Goodwyn by allowing respondent to question the holding periods of the options. Indeed, this matter was initially raised in the petitions.
31. For purposes of this argument respondent does not contend that the options did not constitute capital assets.↩
32. Charles and Goodwyn contend that the values and mortgages attributed to various properties listed on both of Calvin's personal financial statements are inconsistent and thus the statements are unreliable. After an examination of the statements we do not find this assertion to hold any merit.↩