MICHAEL E. MURPHY and KATHERINE L. MURPHY, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Murphy v. Commissioner
Docket No. 4857-91
United States Tax Court
T.C. Memo 1993-292; 1993 Tax Ct. Memo LEXIS 295; 66 T.C.M. (CCH) 32; July 7, 1993, Filed *295 Decision will be entered under Rule 155. For petitioners: Thomas I. Hara. For respondent: Robert F. Cunningham, and Thomas E. Ritter. RAUM
RAUM
MEMORANDUM OPINION RAUM, Judge: The Commissioner determined an income tax deficiency of $ 26,207 for 1986 against petitioners, husband and wife. After certain concessions by petitioners, the remaining issues are: (1) Whether petitioners effectively converted their former residence in Minnesota to an income-producing property prior to sale, thereby enabling them to deduct loss on sale of that residence as well as rental expenses; (2) whether petitioners were entitled to deduct certain expenses claimed as business travel expenses; and (3) whether petitioners were required to include certain reimbursements of travel expenses in income as excess per diem. The facts have been stipulated. All references to petitioner in the singular are to petitioner-husband, who will also be referred to at times as Mr. Murphy. Petitioners resided in Hopkins, Minnesota, at the time they filed their petition herein. 1. Conversion of Residence to Income-Producing Property. For several years prior to and during the taxable year 1986, petitioner was employed *296 by Warrington Associates, Inc. (Warrington), a Minnesota corporation. His post of duty was Birmingham, Alabama, where petitioners resided for several years prior to 1985. In 1985, Warrington advised Mr. Murphy that a sale of the business was contemplated and reassigned him to its Minneapolis headquarters. For various reasons, including uncertainties surrounding the sale of the Warrington business, petitioners did not sell their Alabama residence upon relocation to Minnesota. Although they retained ownership of their Alabama home, they did not offer it or hold it out for rental. They retained their major Alabama banking affiliation and never changed their voting registration or drivers' licenses from Alabama to Minnesota. At some point, petitioners contracted with a builder and built a home in Excelsior, Minnesota. The cost of the new Minnesota property was $ 322,691. As with all such investments, one aspect of petitioners' acquisition of their new Minnesota home was a view to its appreciation for resale purposes. Petitioners occupied their new home in September 1985. Warrington was subsequently sold in early 1986. After several months, Mr. Murphy became pessimistic about *297 his future with the company under its new management and asked for and received a transfer back to Birmingham, Alabama. Petitioners returned to Birmingham in June 1986. Prior to moving back to Birmingham, they listed their Minnesota residence with a realtor. The asking price was $ 319,900. A few days after the listing agreement was signed, petitioners leased their Minnesota property on a month-to-month basis to the contractor who had built the house. He was building another house in the same subdivision and leased petitioners' house "during the construction phase of his next project." [1] The lease agreement called for the lessee to pay rent in the amount of $ 650 per month, maintain the property, and allow for showing of the house by the realtor with whom it was listed. Petitioners considered the contractor an excellent tenant because he had built the house, was constructing another house in the same subdivision, and was known to be reliable. They were therefore willing to lease the property to him for less than its fair rental value. *298 During the late part of the summer of 1986, Mr. Murphy found his employment under the new management to be unsatisfactory, and decided to leave the company. At that point the sale of petitioners' Minnesota property "became essential." They thereafter entered into an agreement to sell the property, which they had already placed in the hands of a broker at least as far back as June 1986. The gross sale price was $ 278,070. The sale was closed in late November 1986, and the lease was then terminated. On their 1986 joint return, petitioners took the position that the lease to the builder converted their former residence in Minnesota from personal use (as a home) to an income-producing property. Accordingly, they deducted not only the $ 38,402 claimed ordinary loss [2] *299 on the sale of the property, but also rental expenses (in excess of rental income) relating to the period that the property was under lease to the builder. [3]
The Commissioner determined that the property had not been "converted to income producing property", that the $ 38,402 deduction of the loss on sale was not allowable, and that although the $ 11,292 mortgage interest component of the $ 15,430 rental loss was deductible, the remaining portion of the rental loss was not deductible. We sustain the Commissioner. Section 165(c)(2)[4]allows individual taxpayers to take a deduction for losses incurred in "any transaction entered into for profit". Section 212(2) similarly allows individual taxpayers to deduct ordinary and necessary expenses "for the management, conservation, or maintenance of property held for the production of income". Accordingly, once it has been established that a taxpayer held property for the production of income and *300 that his or her motives were thus profit-driven, that individual may -- subject to certain limitations not at issue here [5] -- deduct not only the expenses of managing and maintaining the property but also any subsequent loss incurred on the disposition of the property, as hereinafter shown. However, as the applicable Treasury regulations relating to sections 165(c)(2) and 212(2) make clear, if property has been acquired or used as the taxpayer's personal residence, it must be converted to a use related to the production *301 of income in order for the taxpayer to become entitled to deduct such losses and/or expenses. Secs. 1.165-9, 1.212-1, Income Tax Regs.[6] *302 It is clear from the record that petitioners used their home in Minnesota as their personal residence. Accordingly, they may not deduct either the loss on the sale of their Minnesota home or the expenses incurred in leasing the home (other than mortgage interest) unless the property was converted from personal use to use as an income-producing property. Such purpose may be based on rental activity involving the property or on the taxpayer's attempts "to realize a profit representing postconversion appreciation in the market value of the property." Newcombe v. Commissioner, 54 T.C. 1298, 1302 (1970); [7] see also Quinn v. Commissioner, 65 T.C. 523, 526 (1975). In either event, however, it is the taxpayer who bears the burden of establishing that conversion to the requisite profit-motivated purpose has occurred. Grant v. Commissioner, 84 T.C. 809, 825 (1985), affd. without opinion 800 F.2d 260 (4th Cir. 1986); MaDan v. Commissioner, T.C. Memo. 1986-7. And the taxpayer cannot carry that burden merely by showing that there was a purpose of making a profit if that purpose was secondary to a primary nonqualifying purpose. See Austin v. Commissioner, 298 F.2d 583, 584 (2d Cir. 1962), affg. 35 T.C. 221 (1960), where the Court of Appeals accepted this Court's finding that the property involved *303 "was purchased by petitioners primarily for a residence and secondarily to make a profit." (Quoting Austin v. Commissioner, 35 T.C. at 224.) To be sure, the record does show that "one aspect of the petitioners [sic] acquisition of the Minnesota house was a view to its appreciation in value for resale purposes". But the stipulation of the parties weakens that view by describing it generally "As with all such investments." Plainly, petitioners' view to realizing a profit on resale was secondary to their primary purpose of acquiring a residence upon Mr. Murphy's transfer to Minnesota. Although he had misgivings about his future in Minnesota, as evidenced by the fact that certain ties to Alabama were retained as a sort of safety net, the acquisition of the house in which to reside was nevertheless obviously a matter of immediate and first importance. But as the Court noted in Austin v. Commissioner, supra at 584, it is petitioner's "primary motive [that] must be ascertained and given effect." See also Arata v. Commissioner, 277 F.2d 576, 578-579 (2d Cir. 1960), affg. in part, revg. *304 in part 31 T.C. 346 (1958); Meurer v. Commissioner, 221 F.2d 223, 224 (2d Cir. 1955). [8] And petitioners have not proved that their primary objective was to make a profit.
We turn now to the question whether petitioners' primary intention with respect to their Minnesota residence shifted from personal use to the production of income when they subsequently left that property as their home and returned to Alabama. The answer here as in every other case must be arrived at "in light of all of the facts and circumstances" surrounding the particular *305 case. Quinn v. Commissioner, 65 T.C. 523, 526 (1975); see also Newcombe v. Commissioner, 54 T.C. 1298, 1299-1300 (1970). The decided cases have enumerated a number of factors that may be considered to assist in arriving at a final conclusion. See Grant v. Commissioner, 84 T.C. 809, 825 (1985), affd. without opinion 800 F.2d 260 (4th Cir. 1986); Quinn v. Commissioner, supra at 526; Newcombe v. Commissioner, supra at 1299-1300. However, some factors bear more directly than others on the situation at hand. There is no magic formula for weighing these factors to arrive at the final answer, which in the last analysis must depend upon "all the facts and circumstances" surrounding the particular case. We have considered all of the suggested factors, and in our judgment, the bottom line is that at the time of conversion, petitioners' motive was neither to hold the property for profit from rentals nor to realize a profit based on post-conversion appreciation. They have not carried their burden of *306 proving otherwise. It clearly appears on this record that there was no such motive at all, not even a secondary motive to realize a profit on conversion. Their motive plainly was merely to salvage what they could out of what turned out to be an unfortunate situation. The lease was entirely ancillary to petitioners' efforts to dispose of the property. It ran from month-to-month and was terminable on 30 days' notice. The lessee was the builder, who undertook to maintain the property and make it available to be shown to prospective purchasers. He was regarded as reliable. Finally, the rent was less than a fair rental for the property, a circumstance indicative of the absence of a motive to make a profit. See Bolaris v. Commissioner, 776 F.2d 1428, 1432 (9th Cir. 1985), affg. in part and revg. in part 81 T.C. 840 (1983) ("a rental for less than fair market value will most likely not qualify as property being held for the production of income"); cf. Jasionowski v. Commissioner, 66 T.C. 312, 322 (1976). Plainly, the lease was in substance nothing more than a caretaking arrangement pending sale. *307 It did not represent any effort to obtain a flow of net income from the property. Similarly, we can discern no basis for finding that petitioners held their Minnesota home primarily to profit from post-conversion appreciation in value. "The placing of the property on the market for immediate sale, at or shortly after the time of its abandonment as a residence, will ordinarily be strong evidence that a taxpayer is not holding the property for postconversion appreciation in value. Under such circumstances, only a most exceptional situation will permit a finding that the statutory requirement has been satisfied." Newcombe v. Commissioner, supra at 1302; see also Quinn v. Commissioner, supra at 528. Here petitioners listed their property with a broker for sale at an asking price of $ 319,900. Taking into account the fact that they had acquired the property for $ 322,691 only about a year or so earlier, that a broker's commission could reasonably have been anticipated to reduce the net amount available to the sellers, and that the $ 319,900 asking price was merely a starting point for negotiations of the final *308 sales price (which actually turned out to be $ 278,070), we find it incredible that petitioners had any motive whatsoever to realize a profit on any post-conversion appreciation. Plainly, petitioners have not carried their burden of proof to show otherwise. 2. Disallowance of $ 5,950 travel expense deduction. The facts relating to this issue are identical with those relating to the next issue involving the inclusion of $ 1,020 in income. All of the facts before us on these issues are contained in a single paragraph of the stipulation of facts as follows: In connection with his employment with Warrington Associates, Inc., Mr. Murphy was away from home on business 170 days during the calendar year 1986. Warrington Associates paid for Mr. Murphy's transportation and lodging and reimbursed him $ 20.00 per day for other subsistence. The petitioners claimed employee business expenses in the amount of $ 5,950.00 based on a claimed subsistence rate of $ 55.00 per day, e.g. $ 55.00 - $ 20.00 = $ 35.00 x 170 = $ 5,950.00. The petitioners have no substantiation of these expenses. The respondent has limited the petitioners to a subsistence allowance of $ 14.00 per day. Accordingly, *309 the respondent has disallowed the entire amount of the expenses claimed by the petitioners and attributed $ 6.00 per day as income, e.g. $ 20.00 - $ 14.00 = $ 6.00 x 170 = $ 1,020.00. Accordingly, the respondent has adjusted the petitioners [sic] employee business expenses by the amount of $ 6,970.00, e.g. $ 5,950.00 + $ 1,020.00. [Emphasis supplied.]
We consider first the disallowance of the $ 5,950 expense deduction, which petitioners claimed on the basis of expenses of $ 55 a day, an amount allegedly expended by Mr. Murphy for subsistence. Petitioners deducted $ 35 a day, namely, the portion of the $ 55 in excess of the $ 20 per diem which he received. (The relevance of the $ 14 figure referred to in the stipulation will appear hereinafter.) There is no dispute that Mr. Murphy's travel expenses qualify for deduction under section 162(a)(2) as "traveling expenses (including amounts expended for meals and lodging * * *) while away from home in the pursuit of a trade or business". However, that deduction is limited by section 274(d)(1), which states in pertinent part that no such deduction shall be allowed -- unless the taxpayer substantiates by adequate records or *310 by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense * * *, (B) the time and place of the travel, * * * [and] (C) the business purpose of the expense * * *.
Section 274(d)(1) also states that: The Secretary may by regulation provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations. * * *
Since petitioner did not substantiate the expenses in controversy by adequate records or otherwise, no deduction is allowable unless the expenses were within an amount prescribed pursuant to regulations which the Secretary of the Treasury was authorized to issue. The Secretary has promulgated regulations delegating his authority in this respect to the Commissioner of Internal Revenue. Sec. 1.274-5(f) and (h), Income Tax Regs.; sec. 1.274-5T(g) and (j), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). Sections 1.274-5(f) and 1.274-5T(g) vest the Commissioner with discretion to prescribe rules for automatic substantiation of travel expenses generally.[9] And section 1.274-5(h) *311 more specifically authorizes the Commissioner to "establish a method under which a taxpayer may elect to use a specified amount or amounts for meals while traveling in lieu of substantiating the actual cost of meals." [10]
*312 Pursuant to such delegations of authority, the Commissioner has issued certain rulings with which this case is concerned. In the first of these rulings, [11]Rev. Rul. 80-62, 1980-1 C.B. 63, 64, it is stated that: If, in the case of expenses for travel away from home (exclusive of costs of transportation to and from destination), an employer reimburses employees for subsistence or provides the employees with a per diem allowance in lieu of subsistence in an amount that does not exceed the greater of (1) $ 44 per day or (2) the maximum per diem rate authorized to be paid by the Federal Government in the locality in which the travel is performed, such reimbursements and allowances shall be deemed substantiated * * *
The ruling thus deems per diem allowances of $ 44 per day for "subsistence" expenses of business travel to be substantiated without regard to whether such expenses were substantiated *313 or actually incurred. Significantly, the ruling also provides that:
the term "subsistence" includes, but is not limited to, reasonable travel expenses for meals and lodging laundry, cleaning and pressing of clothing, and fees and tips for services, such as for waiters and baggage handlers. * * *. [Id.; emphasis supplied.]
On their return petitioners apparently relied upon this ruling (Rev. Rul. 80-62, supra) in claiming the $ 5,950 deduction, "based on a claimed subsistence rate of $ 55.00 per day, e.g. $ 55.00 - $ 20.00 = $ 35.00 x 170 = $ 5,950." However, the point was not argued in their briefs, and the Government has taken the position in its reply brief that "Petitioner is apparently not contesting the disallowance of the petitioners' employee business expenses in the amount of $ 5,950.00 because there was no argument made as to these amounts on brief." Indeed, the point was not argued either in petitioners' opening brief or in their reply brief, and we agree with the Government that the point must be treated as having been abandoned. [12]
*314 3. Includability of $ 1,020 Excess Per Diem in Gross Income. Next at issue is whether petitioners were required to include in gross income $ 1,020 as excess per diem. The parties have stipulated that Mr. Murphy's employer "paid for Mr. Murphy's transportation and lodging and reimbursed him $ 20.00 per day for other subsistence." As previously indicated, the Commissioner added $ 1,020 to petitioners' gross income for 1986, which amount represented the $ 6 excess of petitioner's daily per diem allowance ($ 20 per day) over the amount claimed by the Commissioner as the applicable limit on substantiation of such per diem allowances ($ 14 per day), multiplied by the number of days that petitioner was on business travel (170). The regulations under section 274 clearly provide that "If the total traveling allowance received exceeds the deductible traveling expenses paid or incurred by the employee, such excess must be reported as income on the employee's return." Sec. 1.274-5(f), Income Tax Regs.; sec. 1.274-5T(g), Temporary Income Tax Regs., 50 Fed. Reg. 46031 (Nov. 6, 1985). The amount, if any, to be reported as income thus depends on the amount of *315 the employee's deductible traveling expenses. But here all the traveling expenses were unsubstantiated and were deductible only to the extent that they were deemed substantiated within limitations specified in rulings of the Commissioner that had been issued pursuant to authority granted in regulations under section 274, supra p. 12. Accordingly, whether the $ 1,020 or any part thereof must be included in petitioners' income depends upon whether (and to what extent, if any) Mr. Murphy's $ 20 per diem exceeded the limit specified by the Commissioner. We hold that the entire $ 20 per diem is within the applicable limit, and that the $ 1,020 is therefore not includable in petitioners' income. As we have already noted, Rev. Rul. 80-62, 1980-1 C.B. 63, 64, provides that employer reimbursements for subsistence and per diem allowances for subsistence expenses incurred away from home on travel are deemed substantiated within the meaning of the applicable regulation, section 1.274-5(c), Income Tax Regs., so long as the amount of such reimbursement or per diem allowance "does not exceed * * * $ 44 per day". The per diem allowance accorded to *316 petitioner ($ 20 per day) was well below that figure. The Commissioner, on brief, relies on another ruling, Rev. Rul. 84-164, 1984-2 C.B. 63, and based on that ruling, maintains that petitioner's per diem allowance can be deemed substantiated under section 274 and the regulations thereunder only to the extent of $ 14 per day. Rev. Rul. 84-164provides in pertinent part that: if, in the case of expenses for travel away from home (other than costs of transportation to or from the destination) in the pursuit of a trade or business, an employer reimburses its employees for meal expenses, or provides its employees with a per diem allowance in lieu of meal expenses in the amount of * * * $ 14 per day for such travel that requires a stay of less than 30 days, * * * [then] these reimbursements and allowances shall be deemed substantiated within the meaning of section 1.274-5(c)" of the regulations. [ Rev. Rul. 84-164, supra, at 63; emphasis supplied.]
Rev. Rul. 84-164 also explicitly states that " Rev. Rul. 80-62 *317 does not apply to reimbursement arrangements or per diem allowances intended to cover only employee meal expenses". Id. at 63. The per diem allowance at issue herein was not, however, "intended to cover only meal expenses." It was instead intended to cover all "other subsistence" above and beyond transportation and lodging. And as previously noted, supra p. 14, the term "subsistence" is not limited to travel expenses for meals or lodging but instead also includes a variety of other travel expenses such as laundry, cleaning and pressing of clothing, and fees and tips for various services, including waiters and baggage handlers. The limitation on deemed substantiation applicable to petitioner's per diem allowance was, therefore, the limitation set forth in Rev. Rul. 80-62 on per diem allowances for subsistence generally ($ 44 per day), and not the limitation in Rev. Rul. 84-164 governing per diem allowances for meals only ($ 14 per day). [13] Since the per diem allowance to petitioner ($ 20 per day) did not exceed the applicable limit on deemed substantiation *318 (and hence the deductible amount) of such expenses, the amounts were not includable by petitioner in gross income. Accordingly, we hold that petitioners were not required to include the $ 1,020 in gross income as excess per diem, pursuant to sections 1.274-5(f), Income Tax Regs., and 1.274-5T(g), Temporary Income Tax Regs., 50 Fed. Reg. 46030 (Nov. 6, 1985). *319 Decision will be entered under Rule 155. Footnotes
1. The petition suggests that the builder required temporary housing for himself while building the other house in the subdivision.↩
2. The claimed $ 38,402 loss was computed as follows: ↩
Gross Sales Price
$ 278,070 Cost
$ 322,691
Accumulated Depreciation
6,219
Adjusted Basis
316,472 Total Gain (or Loss)
$ (38,402)
3. The claimed deduction relating to rental expenses was computed as follows: ↩
Rental Income
$  3,900
Rental Expenses:
Cleaning & Maintenance
$   200
Insurance
320
Mortgage Interest
11,292
Utilities
1,299
Depreciation
6,219
Total Deductible Expenses
19,330
Deductible Rental Loss
$ 15,430
4. Except as otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
5. For example, if an individual taxpayer sustains a loss on the sale of a capital asset, the taxpayer's deduction for that loss would ordinarily be subject to limitations applicable to capital losses, notwithstanding the fact that the property was held for the production of income. See sec. 1211.↩
6. Sec. 1.165-9, Income Tax Regs., provides: (a) Losses not allowed. A loss sustained on the sale of residential property purchased or constructed by the taxpayer for use as his personal residence and so used by him up to the time of the sale is not deductible under section 165(a). (b) Property converted from personal use. (1) If property purchased or constructed by the taxpayer for use as his personal residence is, prior to its sale, rented or otherwise appropriated to income-producing purposes and is used for such purposes up to the time of its sale, a loss sustained on the sale of the property shall be allowed as a deduction under section 165(a).
Sec. 1.212-1(h), Income Tax Regs., provides: (h) Ordinary and necessary expenses paid or incurred in connection with the management, conservation, or maintenance of property held for use as a residence by the taxpayer are not deductible. However, ordinary and necessary expenses paid or incurred in connection with the management, conservation, or maintenance of property held by the taxpayer as rental property are deductible even though such property was formerly held by the taxpayer for use as a home.↩
7. In Newcombe v. Commissioner, 54 T.C. 1298, 1301 (1970), it was stated: There is no requirement under section 212(2)↩ that the income be recurrent in nature, as rent normally is. On particular facts, property held solely for sale may be "property held for the production of income."
8. Arata v. Commissioner, 277 F.2d 576 (2d Cir. 1960), affg. in part, revg. in part 31 T.C. 346 (1958), and Meurer v. Commissioner, 221 F.2d 223 (2d Cir. 1955), involved the deductibility of losses under sec. 23(e)(2) of the Internal Revenue Code of 1939↩, the predecessor of the provisions of the Internal Revenue Code involved herein.
9. Secs. 1.274-5(f), Income Tax Regs., and 1.274-5T(g), Temporary Income Tax Regs., 50 Fed. Reg. 46030 (Nov. 6, 1985) both provide in pertinent part as follows: The Commissioner may, in his discretion, prescribe rules under which -- (1) Reimbursement arrangements covering ordinary and necessary expenses of traveling away from home (exclusive of transportation expenses to and from destination), [and] (2) Per diem allowances providing for ordinary and necessary expenses of traveling away from home (exclusive of transportation costs to and from destination), * * *
* * * will, if in accordance with reasonable business practice, be regarded as equivalent to substantiation by adequate records * * * of the amount of such traveling expenses * * *.↩
10. The provisions of secs. 1.274-5(h), Income Tax Regs., and 1.274-5T(j), Temporary Income Tax Regs., 50 Fed. Reg. 46032-46033 (Nov. 6, 1985), are essentially the same. The latter reads in pertinent part as follows: The Commissioner may establish a method under which a taxpayer may elect to use a specified amount or amounts for meals while traveling away from home in lieu of substantiating the actual cost of meals. The taxpayer would not be relieved of substantiating the actual cost of other travel expenses * * *.↩
11. A second ruling is dealt with in connection with the final issue herein.↩
12. Although we have thus not passed upon petitioners' right to the $ 5,950 deduction, we have nevertheless set forth above materials involving Rev. Rul. 80-62, 1980-1 C.B. 63↩, 64, which relate to the deduction, since they are interrelated with the revenue ruling to be considered in the next issue.
13. Rev. Rul. 80-62 has been superseded by Rev. Proc. 89-67, 1989-2 C.B. 795 "for per diem allowances paid to an employee on or after January 1, 1990, with respect to lodging, meal, and incidental expenses paid or incurred for travel while away from home on or after January 1, 1990." (Rev. Proc. 89-67, supra, at 799.) Rev. Rul. 84-164, 1984-2 C.B. 63, has also been superseded by Rev. Proc. 89-67 "for per diem allowances * * * paid to an employee in taxable years of the employee beginning on or after January 1, 1989, with respect to meal and incidental expenses paid or incurred in taxable years beginning on or after January 1, 1989." (Rev. Proc. 89-67, supra at 800.) Since the taxable year at issue herein is the 1986 calendar year, however, Rev. Proc. 89-67↩ is not applicable to the case before us.