# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 14, 2021

Lyle W. Cayce
Clerk

No. 20-60004

Ames D. Ray,

*Petitioner—Appellant*,

*versus*

Commissioner of Internal Revenue,

*Respondent—Appellee*.

Appeal from the United States Tax Court
USTC No. 14052-16

Before Dennis, Higginson, and Willett, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

Appellant Ames D. Ray claimed a deduction for certain legal expenses on his 2014 federal income tax return. The Internal Revenue Service disallowed this deduction and issued a notice of deficiency to Ray. The IRS imposed an accuracy-related penalty in addition to the deficiency amount. Ray filed a petition with the U.S. Tax Court challenging the deficiency determination and the imposition of the accuracy-related penalty. Following a one-day trial, the Tax Court issued a decision upholding in part the IRS's deficiency determination and imposition of the accuracy-related penalty. Ray timely appealed the Tax Court's decision. We affirm in part and reverse and remand in part.

No. 20-60004

## I.

This case concerns deductions appellant Ames Ray claimed on his 2014 federal income tax return for legal expenses incurred in litigation against his ex-wife, Christina Ray, and her attorneys. This litigation has been ongoing for over twenty years, involves four separate lawsuits, and implicates facts dating back several decades.

## A.

Ames and Christina Ray met while they were undergraduate students at Michigan State University, where both obtained advanced degrees in physics. They married in 1972 and moved to New York City in 1976. Christina developed a career in the finance industry, eventually serving as an officer at multiple financial institutions. She developed mathematical models for commodities trading and authored several books on risk management and options trading. In 1990, she founded a consulting firm to advise finance industry clients. Ames also worked for several financial institutions during the early stages of his career, but was never a commodities trader. In 1979, he developed a computer program that could analyze Securities and Exchange Commission filings, search for company information, and print financial statements, which he named "Firm Decisions." Ames licensed this software to Citibank and received income from Citibank for the software until 1986.

Ames and Christina divorced in 1977, though they continued to live together off and on until 1992, when Ames moved to Florida. During the time that they lived together after their divorce, the couple continued to maintain joint banking and credit-card accounts and own shared assets. The Rays used a ledger system to track their joint and separate expenses, as well as financial transactions between them.

Over time, Christina incurred various debts to Ames, which the couple formalized in several written documents. In 1981, Ames and Christina

jointly purchased land in Sagaponack, New York with the intent of building a vacation home on the land. Due to disagreements over construction, in 1984 Ames sold his share of the property to Christina for $350,000. Ames lent this amount to Christina in exchange for her agreement to make regular payments to him. The Rays memorialized this agreement in a written document, which they notarized and accounted for in their ledger system.

A second real-estate transaction followed. The Rays lived in an apartment on East 87th Street in Manhattan from the time they moved to New York City in 1976. When that apartment was converted to a co-op around 1987, the Rays purchased shares in the co-op. In November 1991, Ames sold his interest in the co-op shares to Christina, memorialized by a document they each signed. Christina executed a note to Ames for $432,427, dated November 25, 1991. According to Ames, this note covered the amounts Christina owed him for both the Sagaponack property and the Manhattan apartment.

Also in November 1991, Ames and Christina signed a document stating that Christina was solely liable for six different credit-card accounts in Ames's name due to her charges to those accounts. The document further stated that Christina would either close out or remove Ames's name from each account. Until Christina did so, the agreement would require her to spend no more than $1,800 per month on living and non-reimbursed business expenses.

In April 1993, Christina signed a $532,288.10 "judgment by confession" in favor of Ames. The judgment by confession stated that it represented amounts due from Christina to Ames for (1) Christina's default on the November 25, 1991 promissory note, (2) $99,860.43 in additional credit-card debt that Ames had paid or would pay on Christina's behalf, (3) "legal and associated expenses incurred in connection with the

enforcement of the note," and (4) interest due on these amounts through March 22, 1993. The judgment by confession was never entered in any court.

In September 1993, Christina signed a letter to Ames stating that she would provide him with notarized financial statements on a semiannual basis until the judgment-by-confession amount was paid in full. Christina would be liable for a $50 penalty for each day she was late in providing her financial statements to Ames.

On August 10, 1994, Christina signed another letter to Ames, this one summarizing her debts to him, which then totaled $590,222.79. This amount covered (1) the $532,288.10 represented by the judgment by confession, (2) $18,774.24 for late financial statements plus interest, (3) additional credit-card debt and related interest, and (4) a reduction for a rent adjustment of $48,625.

In early 1993, Christina approached Ames with a proposal to use a trading method she had developed to "mak[e] money trading futures and options." On May 24, 1993, the Rays formalized the terms of their arrangement in a written document (the "trading agreement"). The document stipulated that Christina would manage the trading of Ames's commodities brokerage account in her "sole discretion." Christina was to provide monthly reports to Ames with the "analysis, rationale, and logic of trades and positions." Ames would pay Christina a 7 percent commission on the increase in value of the account on a monthly basis. The trading agreement further provided that "[Christina] and [Ames] may advertise the accurate results of [Christina's] trading [of Ames's] account." The trading agreement stated that it would automatically terminate as of November 1993, and that because Christina was to trade Ames's account "for hire," Ames would be "permitted to terminate [the trading agreement] at any time."

No. 20-60004

Ames deposited $500,000 into his commodities brokerage account so that Christina could trade his account pursuant to the trading agreement.

On June 14, 1993, Ames proposed an amendment to the trading agreement that provided: "You'll pay to me the amount of money that my account falls below $350[,000] . . . . Otherwise, trade my account to liquidate positions when my account's value falls below $350[,000]." Christina signed the amendment on September 4, 1993. However, by the time Christina signed the amendment, the account's value had already declined to $1,285, and she had thus stopped trading on the account due to insufficient capital. In August 1994, Christina signed a letter to Ames confirming that she owed him $384,388 for the losses to the commodities account plus interest.

Ames deducted his trading agreement losses as a Schedule C business loss on his 1993 tax return. The Internal Revenue Service (IRS) disallowed the deduction and sent Ames a notice of deficiency. Ames disputed the IRS's deficiency determination in the U.S. Tax Court, and he and the IRS eventually reached a settlement, which was entered by the Tax Court on December 16, 1997 as a stipulated decision "[p]ursuant to the agreement of the parties." Under the stipulated decision, Ames was charged a deficiency of $88,926.42 for the 1993 tax year and was still allowed to deduct $374,102.00 as a Schedule C business loss labeled "Futures Trader."

Then came litigation. On September 9, 1998, Ames filed a lawsuit against Christina in the New York Supreme Court for New York County (*Ray v. Ray*, Index No. 604381/98) ("*Ray I*"). Ames alleged two causes of action arising from (1) Christina's failure to pay any part of the indebtedness amount summarized by the August 10, 1994 letter (representing her debts resulting from the two real estate purchase loans, the credit-card debt, and the late financials) and (2) Ames's losses under the trading agreement. The New York Supreme Court dismissed the complaint on January 11, 2008.

Ames appealed, and on April 7, 2009, the Appellate Division of the Supreme Court of New York overturned the dismissal. As of June 2020, the case remained pending. *See Ray v. Ray*, 149 N.E.3d 443 (N.Y. 2020). In 2014, Ames incurred $77,724 in legal expenses for *Ray I*.

On October 20, 2010, Ames again sued Christina in the New York Supreme Court for New York County (*Ray v. Ray*, Index No. 652314/2010) ("*Ray II*"). Ames alleged that Christina owed him at least $970,000, and that she had fraudulently conveyed property to avoid paying Ames. The New York Supreme Court dismissed the complaint on July 12, 2011, and the Appellate Division affirmed on July 9, 2013. Ames did not incur any legal expenses for *Ray II* in 2014.

Ames filed another fraudulent conveyance lawsuit against Christina and her business, Guarnerius Management, LLC, in the New York Supreme Court on April 24, 2014 (*Ray v. Ray et al.*, Index No. 153945/2014) ("*Ray III*"). Ames alleged that Christina mortgaged the Manhattan co-op for $500,000 and then fraudulently conveyed that amount—$80,000 to pay for legal fees and the remaining $420,000 to Guarnerius. The New York Supreme Court dismissed the complaint on December 22, 2014. Ames spent $151,500 on legal expenses for *Ray III* in 2014.

On January 22, 2016, Ames sued Christina's *Ray I* attorneys in the United States District Court for the Southern District of New York, alleging that they had made deceitful statements and representations to the trial and appellate courts in *Ray I* in order to obtain an advantage in the litigation (Case No. 1:15-cv-10176-JSR) ("*Ray IV*"). The district court dismissed the complaint on April 26, 2016, and the United States Court of Appeals for the Second Circuit affirmed the dismissal on April 14, 2017. Although Ames did not file his complaint in *Ray IV* until 2016, he incurred $38,000 in legal expenses for the case in 2014.

No. 20-60004

That brings us to the tax deductions at issue on appeal. On his 2014 federal income tax return, Ames reported a negative amount of $238,937 as "[o]ther income" with the label "legal fees, costs." Ames did not file a Schedule C (Profit or Loss from Business) with his 2014 tax return.

The IRS issued a notice of deficiency to Ames, informing him that the IRS had disallowed the legal expense deduction and imposed a 20 percent accuracy-related penalty pursuant to Internal Revenue Code § 6662(a).

**B.**

Ames filed a petition with the U.S. Tax Court challenging the deficiency determination and the imposition of the accuracy-related penalty. He claimed that the IRS had erred in disallowing the deduction for his legal expenses, arguing that they were "deductible either under [26 U.S.C.] § 162, [26 U.S.C.] § 212 or as a capital loss in connection with a hedge fund of which [Ames] was founder, and an officer and director." The Tax Court held a one-day trial on May 3, 2017, and issued an opinion on April 15, 2019.

Applying the preponderance of the credible evidence standard, the Tax Court found that none of Ames's legal expenses was eligible for a deduction as an expense of carrying on a trade or business under § 162(a) of the Internal Revenue Code. The Tax Court next held that the portion of Ames's legal expenses related to the trading agreement losses (those legal expenses attributable to the second cause of action in *Ray I* and part of *Ray III*)—but not the portion of his legal expenses related to his efforts to recover on his ex-wife's indebtedness for the Sagaponack property purchase, the Manhattan apartment purchase, the credit-card debt, and the late financial statements (those legal expenses attributable to the first cause of action in *Ray I*, part of *Ray III*, and all of *Ray IV*)—*could* be deducted under Internal Revenue Code § 212. The Tax Court applied the "*Cohan* rule" (from *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930)), using the ratio of damages

7

attributed to each *Ray I* cause of action, to determine that Ames could deduct 39.5 percent of the *Ray I* and *Ray III* legal expenses he paid in 2014 under § 212.

The Tax Court found Ames liable for an accuracy-related penalty under Internal Revenue Code § 6662(a), (b)(1) and (2). The Tax Court further found that Ames had failed to carry his burden of proof in establishing an affirmative defense to the penalty.

Following the issuance of the Tax Court opinion, the Tax Court entered its decision and adopted the IRS's proposed deficiency computation. The deficiency computation deducted from Ames's taxable income 39.5 percent of Ames's 2014 legal expenses from *Ray I* and *Ray III* (the expenses related to his losses under the trading agreement), which the Tax Court had determined Ames could deduct as expenses for the production of income under § 212. The computation imposed a 20 percent penalty on Ames's underpayment. The penalty was not imposed on any underpayment attributable to legal expenses concerning the trading agreement losses, which Ames was allowed to deduct under § 212. But the penalty was imposed on the underpayment attributable to (1) the difference in the amounts Ames would be allowed to deduct for legal expenses for the trading agreement losses if they were deductible under § 162(a) rather than § 212, and (2) Ames's deduction of his legal expenses relating to his litigation to recover on his ex-wife's indebtedness.

Ames timely appealed the Tax Court's decision.

## II.

This court applies the same standard of review to a decision of the U.S. Tax Court as it would to a federal district court decision. We review factual findings for clear error and legal determinations de novo. *Estate of Duncan v. Comm'r*, 890 F.3d 192, 197 (5th Cir. 2018) (citing *Terrell v.*

*Comm'r*, 625 F.3d 254, 254 (5th Cir. 2010)). "Clear error exists when this [C]ourt is left with the definite and firm conviction that a mistake has been made." *Terrell*, 625 F.3d at 258 (alteration in original) (quoting *Green v. Comm'r*, 507 F.3d 857, 866 (5th Cir. 2007)).

## III.

We first consider whether the Tax Court erred in finding that Ames Ray (hereinafter referred to as "Ray") cannot deduct his legal expenses from litigating to recoup his losses under the trading agreement as expenses of carrying on a trade or business under § 162(a) of the Internal Revenue Code. The Tax Court held that Ray could not deduct any of his 2014 legal fees as expenses of carrying on a trade or business under § 162(a), finding that (1) the claims underlying the litigation to recover on Christina Ray's indebtedness lacked any nexus to Ray's purported computer programming business, and (2) the claims underlying the litigation to recoup the trading agreement losses lacked a sufficient nexus to a trade or business carried on by Ray because "the purported business was in actuality Ms. Ray's management of a hedge fund and [] [Ray's] involvement in her management of that fund extended no further than his initial investment."

On appeal, Ray argues that the Commissioner is collaterally estopped from litigating the issue of whether the origin of the claims underlying Ray's 2014 legal expenses relating to his trading agreement loss is a "business investment" because the 1997 stipulated Tax Court decision determined that his loss under the trading agreement was a deductible business loss. Ray argues in the alternative that he is entitled to a § 162(a) deduction for his legal expenses regarding the trading agreement losses because he and Christina Ray were jointly engaged in a hedge fund business and collaborated to develop a trading program, and the claims underlying the legal expenses were related to this business.

No. 20-60004

The Commissioner counters that Ray failed to preserve his collateral estoppel argument in the Tax Court because he raised the issue for the first time in his post-trial answering brief. Even so, the Commissioner further maintains that collateral estoppel does not apply because the 1997 stipulated Tax Court decision was entered pursuant to the agreement of the parties, and thus the issue of whether the trading agreement loss was a deductible business loss was not actually litigated. In response to Ray's alternative argument on the merits of § 162(a) deductibility, the Commissioner avers that Ray did not carry on the trading venture as a trade or business and was nothing more than an investor.

We consider, as a threshold matter, Ray's argument that the Commissioner is collaterally estopped from litigating the issue of whether the origin of the claims underlying Ray's trading agreement-related litigation is a business loss entitling him to a § 162(a) deduction. Finding that collateral estoppel does not bar the Commissioner from litigating this issue, we then assess whether Ray is entitled to a § 162(a) business-expense deduction for the portion of his 2014 legal expenses incurred in his efforts recoup his losses under the trading agreement.

## A.

An argument not raised before the trial court cannot be raised for the first time on appeal. *XL Specialty Ins. Co. v. Kiewit Offshore Servs.*, 513 F.3d 146, 153 (5th Cir. 2008) (citing *Stokes v. Emerson Elec. Co.*, 217 F.3d 353, 358 n.19 (5th Cir. 2000)). For an argument to be preserved, it "must be raised to such a degree that the trial court may rule on it." *Id.* (quoting *Butler Aviation Int'l v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1128 (5th Cir. 1993), *abrogated on other grounds as recognized in Matter of Diaz*, 972 F.3d 713, 720 n.6 (5th Cir. 2020)). Under the Tax Court Rules of Practice and Procedure, Rule 39, an affirmative defense such as collateral estoppel must be set forth

10

No. 20-60004

in a party's pleading or else will be deemed abandoned. TAX CT. R. 39; *Jefferson v. Comm'r*, 50 T.C. 963, 966–67 (1968). The Tax Court does not consider issues raised for the first time in an answering brief. *Dutton v. Comm'r*, 122 T.C. 133, 142 (2004); *accord Clay v. Comm'r*, 152 T.C. 223, 236 (2019).

In his appellate briefing, Ray suggests that he first raised his asserted collateral estoppel defense in his pre-trial submission. To the contrary, Ray's pre-trial submission merely mentioned the 1997 stipulated Tax Court decision but did not assert collateral estoppel. Ray did not raise his asserted collateral estoppel defense until his post-trial answering brief.

Because the Tax Court does not consider issues raised for the first time in an answering brief, Ray did not raise the collateral estoppel defense "to such a degree that the [Tax Court could] rule on it" in accordance with this court's preservation standard. *See XL Specialty Ins. Co.*, 513 F.3d at 153 (quoting *In re Fairchild Aircraft Corp.*, 6 F.3d at 1128). We thus find that Ray has failed to preserve his asserted collateral estoppel defense.

## B.

We now turn to the merits of Ray's argument that his 2014 legal expenses incurred litigating to recover his trading agreement losses are deductible as expenses of a trade or business under § 162(a).[1] The Tax Court found that these legal fees are not deductible as expenses of a trade or business under § 162(a), but did find that that Ray could deduct these legal fees as expenses for the production of income under § 212. Neither party

---

[1] Ray has abandoned by failing to brief any argument he might have against the Tax Court's finding that Ray's 2014 legal expenses incurred litigating to recover on his ex-wife's indebtedness are not deductible business expenses under § 162(a). *See Coury v. Moss*, 529 F.3d 579, 587 (5th Cir. 2008).

disputes the Tax Court's finding that these legal fees are deductible under § 212. This issue remains justiciable, however, because Ray would receive greater tax-liability relief if he were able to deduct these expenses under § 162(a) rather than § 212. *See Green*, 507 F.3d at 870 n.7 (discussing the comparative advantage of deducting an expense under Internal Revenue Code § 162(a) versus § 212).

Section 162(a) of the Internal Revenue Code allows taxpayers to deduct from their taxable income "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." I.R.C. § 162(a). Because "an income tax deduction is a matter of legislative grace," a taxpayer claiming a business-expense deduction under § 162(a) has the burden to prove that the expense is rooted in the taxpayer's trade or business. *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992) (quoting *Interstate Transit Lines v. Comm'r*, 319 U.S. 590, 593 (1943)); *see also Marcello v. Comm'r*, 380 F.2d 499, 504 (5th Cir. 1967); *Brinkley v. Comm'r*, 808 F.3d 657, 663 (5th Cir. 2015) ("As a general rule, the Commissioner's determination of a tax deficiency is presumed correct, and the taxpayer has the burden of proving the determination to be erroneous.").

The phrase "trade or business" in § 162(a) "connotes something more than an act or course of activity engaged in for profit." *Stanton v. Comm'r*, 399 F.2d 326, 329 (5th Cir. 1968) (quoting *McDowell v. Ribicoff*, 292 F.2d 174, 178 (3d Cir. 1961)). A taxpayer can show that his activities constitute a trade or business within the meaning of § 162(a) by demonstrating that he engaged in "extensive activity over a substantial period of time during which the [t]axpayer holds himself out as selling goods or services." *Id.* (quoting *McDowell*, 292 F.2d at 178); *accord Louisiana Credit Union League v. United States*, 693 F.2d 525, 532 (5th Cir. 1982). "One prearranged deal does not evidence the continuity and regularity found in trades or businesses." *Harris v. Comm'r*, 16 F.3d 75, 81 (5th Cir. 1994). The

taxpayer's management of his own investments is not a trade or business. *Zink v. United States*, 929 F.2d 1015, 1021 (5th Cir. 1991).

Legal expenses can be deductible as business expenses under § 162(a). *Estate of Meade v. Comm'r*, 489 F.2d 161, 164–66 (5th Cir. 1974). In *United States v. Gilmore*, the Supreme Court established the origin-of-the-claim test to determine whether a legal expense is deductible. 372 U.S. 39, 48–49 (1963). The origin-of-the-claim test asks the court to consider "the origin and character of the claim with respect to which [a legal] expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer," to determine whether the expense is a business or a personal expense, and thus "whether it is deductible or not." *Gilmore*, 372 U.S. at 49; *see also Estate of Meade*, 489 F.2d at 165. In applying the origin-of-the-claim test to determine whether a legal expense is deductible, courts should consider the issues, nature, and objectives of the lawsuit, the defenses asserted, the purpose of the expenses, and the background of the litigation. *Morgan's Estate v. Comm'r*, 332 F.2d 144, 151 (5th Cir. 1964).

We review the Tax Court's factual finding as to whether the taxpayer was carrying on a trade or business for clear error and its legal conclusions de novo. *See Green*, 507 F.3d at 871 ("The determination of whether [the taxpayer] was engaged in carrying on a trade or business is a determination of fact that we review for clear error."); *Brinkley*, 808 F.3d at 664.

In order to reverse the Tax Court on this issue, we would need to find that the Tax Court clearly erred in finding that the origin of the claims underlying Ray's litigation to recoup his losses under the trading agreement did not relate to his engagement in a trade or business within the meaning of § 162(a). This issue involves two distinct inquiries: (1) Did the Tax Court clearly err in characterizing the trading agreement venture as "Ms. Ray's management of a hedge fund" rather than a computer programming

business?; and (2) Did the Tax Court clearly err in finding that Ray was not involved in the trading agreement venture as a trade or business, but rather was merely an investor in the venture?

In the Tax Court, Ray argued that the trading agreement venture was an extension of his earlier computer programming business because he took part of his settlement from litigation involving his Firm Decisions software and invested it in the trading agreement venture "to continue developing programs for Wall Street." The Tax Court rejected this argument, finding that "the purported business was in actuality Ms. Ray's management of a hedge fund." On appeal, Ray again attempts to characterize the trading agreement venture as tied to his earlier computer programming business. However, Ray does not point to any facts establishing a link between the trading agreement venture and Ray's earlier computer programming business beyond the source of funding. In his testimony before the Tax Court, in his post-trial brief, and again in his appellate brief, Ray states that the purpose of the trading agreement venture was to test the trading strategies that Christina Ray had developed. Although these trading strategies involved computer programs, Ray cites no evidence establishing that these computer programs were related to his earlier computer programming business or were developed by Ray. The Tax Court thus did not clearly err in characterizing the trading agreement venture as "Ms. Ray's management of a hedge fund."

Ray further argues that he engaged in the trading agreement venture as a trade or business within the meaning of § 162(a) because the venture was a joint collaboration with his ex-wife "to profit from the track record they sought to establish using Christina's trading strategies." To establish that he was engaged in a trade or business under § 162(a), Ray must demonstrate that he engaged in "extensive activity over a substantial period of time" with respect to the purported business. *Stanton*, 399 F.2d at 329. A mere profit

motive does not establish engagement in a trade or business, and the management of one's own investments is not a trade or business. *Id.*; *Zink*, 929 F.2d at 1021.

Nothing in the record establishes that Ray engaged in the trading agreement venture with "continuity and regularity." *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987). Ray argues that "[c]onsistent with *Groetzinger*, Ray was regularly and continuously engaged in writing and creating financial software programs of a decision making and predictive nature from 1976 through the end of his collaboration with Christina." Ray does not identify evidence in the record, however, establishing that Ray developed the computer programs that Christina Ray used in the trading agreement venture or meaningfully contributed to Christina's development of these programs. As noted, Ray repeatedly characterized the purpose of the trading agreement venture as testing the trading strategies that Christina had developed. Ray also does not cite evidence showing that he participated in the trading aspect of the purported business. In fact, in *Ray I*, Ray testified that he did not "remember spending much time developing programs and models," and that trading was Christina's profession rather than his. Under the terms of the trading agreement, Ray disclaimed any right to be actively involved in the trading aspect of the purported business, as the agreement gave Christina Ray the authority to trade Ray's commodities account in her sole discretion.

Ray argues that the trading agreement's language providing that either party could "advertise the accurate results" of Christina Ray's trading of Ray's account shows that "[t]here was a clear purpose and intent to commercially exploit what both believed would be a profitable program." The existence of an intent to commercially exploit the trading program does not show that Ray engaged in extensive activity over a substantial period of time with respect to the purported trading business. Moreover, the existence

of a profit motive does not establish a trade or business within the meaning of § 162(a). *Stanton*, 399 F.2d at 329.

Ray has not carried his burden of proof to show that the origin of the claims underlying his litigation to recoup his trading agreement losses—the trading agreement venture—was related to his engagement in a trade or business within the meaning of § 162(a). Accordingly, the Tax Court did not clearly err in finding that Ray is not entitled to deduct his 2014 legal expenses under § 162(a).

## IV.

We next consider whether the Tax Court erred in finding that Ray cannot deduct his legal expenses incurred litigating to recover on his ex-wife's indebtedness as expenses for the production of income under § 212(1) of the Internal Revenue Code.

The Tax Court found that Ray's legal expenses relating to the first cause of action in *Ray I*, *i.e.*, those incurred litigating to recover on Christina Ray's debts to Ray for (1) the Sagaponack property purchase, (2) the Manhattan apartment purchase, (3) the charges to Ray's credit-card accounts, and (4) the late financial statements, are not deductible as expenses for the production of income under § 212(1). On appeal, Ray argues that the Tax Court erred in finding against deductibility because each of the relevant debt instruments was an interest-bearing, income-producing asset to Ray. The Commissioner counters that none of the claims underlying the first cause of action in *Ray I* was a claim for the production or collection of income because "all of the debts were personal debts unrelated to the production of income."

Section 212(1) of the Internal Revenue Code allows taxpayers to deduct "all the ordinary and necessary expenses paid or incurred . . . for the production or collection of income." I.R.C. § 212(1). Once again, the

Commissioner's deficiency determination is "presumptively correct," and the taxpayer bears the burden of demonstrating their entitlement to a deduction. *Payne v. Comm'r*, 224 F.3d 415, 420 (5th Cir. 2000); *INDOPCO*, 503 U.S. at 84.

The key inquiry for determining deductibility under § 212(1) is "whether the expenditures were made primarily in furtherance of a bona fide profit objective." *Westbrook v. Comm'r*, 68 F.3d 868, 875 (5th Cir. 1995) (internal quotation marks omitted) (quoting *Agro Sci. Co. v. Comm'r*, 934 F.2d 573, 576 (5th Cir. 1991)). "A deduction claimed under § 212(1) must meet the same requirements applicable to trade or business expenses under § 162, except that the person claiming the deduction need not be in the trade or business." *Green*, 507 F.3d at 870 (internal quotation marks omitted) (quoting *Simon v. Comm'r*, 830 F.2d 499, 501 (3d Cir. 1987)).

The origin-of-the-claim test applies to determine the deductibility of legal expenses under § 212(1) just as it applies to the deductibility of such expenses under § 162(a). Applying the origin-of-the-claim test, legal fees are considered personal expenses and thus not deductible under § 212(1) if the claims underlying the lawsuit are personal in nature. *See Colvin v. Comm'r*, 122 F. App'x 788, 790 (5th Cir. 2005).

In considering the Tax Court's conclusion as to whether legal fees are deductible as expenses incurred for the production of income, we review the Tax Court's factual finding regarding profit motive for clear error and its legal conclusions do novo. *See Westbrook*, 68 F.3d at 876; *Colvin*, 122 F. App'x at 790.

We must decide whether the Tax Court clearly erred in finding that the origins of the claims underlying Ray's litigation to recover on Christina Ray's indebtedness were not related to the production or collection of income within the meaning of § 212(1). In determining whether Ray's legal

expenses incurred litigating to recover on the principal of Christina Ray's indebtedness are deductible under § 212(1), the key question is whether Ray entered into each of the following transactions "in furtherance of a bona fide profit objective," *Westbrook*, 68 F.3d at 875: (1) Ray's ownership and sale of the Sagaponack property; (2) Ray's ownership and sale of the Manhattan apartment; (3) Ray's arrangement with Christina Ray regarding the charges she incurred on his credit-card accounts; and (4) Ray's agreement with Christina Ray for her to provide him with regular financial statements. We address each of these transactions in turn.

Tax Court caselaw addressing the § 212 deductibility of expenses incurred in the maintenance and sale of properties distinguishes between personal residences and investment properties. *See, e.g.*, *Murphy v. Comm'r*, 66 T.C.M. (CCH) 32, *2 (1993) (stating that, in determining the § 212 deductibility of property-related expenses, "if property has been acquired or used as the taxpayer's personal residence, it must be converted to a use related to the production of income in order for the taxpayer to become entitled to deduct such losses and/or expenses"); *Thomas v. Comm'r*, 42 T.C.M. (CCH) 496 (1981) (providing that the deductibility of property-related costs incurred prior to sale "depends upon whether the taxpayer has shown that a conversion of the property for the production of income has occurred"). A taxpayer can show that his property was converted from personal residential use to profit-producing use by demonstrating that he rented the property out to third parties or that, after converting the property from residential to investment use, he held the property and attempted to realize a profit from the appreciation in market value. *Murphy*, 66 T.C.M. (CCH) at *2 & n.7 (citing *Newcombe v. Comm'r*, 54 T.C. 1298, 1302 (1970)).

The record shows that both the Sagaponack property and the Manhattan apartment were used by Ames and Christina Ray for residential purposes for the entire period prior to Ames's sale of his interest in the

No. 20-60004

properties to Christina. Ames and Christina Ray jointly purchased the Sagaponack property for the purpose of building a vacation home on the land. Construction of this vacation home was ongoing at the time that Ray sold his interest in the land to his ex-wife. The record does not support clear error on the ground that Ames and Christina Ray rented the property or were holding the land for an investment rather than a residential purpose. Likewise, Ames and Christina Ray owned the Manhattan co-op shares for personal residential use for the full time period prior to Christina's purchase of Ray's interest in the shares. The record does not support clear error on the ground that Ray and Christina Ray rented the Manhattan apartment to third parties or ceased their residential use and held the property for investment purposes.

The record also does not support clear error on the ground that Ray entered into the agreements with Christina regarding her personal charges to his credit-card accounts or the penalty for late financial statements with the primary motive of profiting from these arrangements. In a deposition in *Ray I*, Ray testified that he entered into the arrangement with respect to Christina's credit-card charges because he and his ex-wife had identified charges that were solely Christina's responsibility and they intended to further separate their finances. Ray also suggested in deposition testimony that he entered into the agreement for Christina Ray to provide him financial statements in order to obtain better assurance that she could repay him for her debts. All of these debt arrangements were thus personal rather than profit-motivated. None of the origins of the claims underlying Ray's litigation to recover the principal amount of Christina Ray's indebtedness is related to the production or collection of income.

In his brief, Ray relies on *Green*, 507 F.3d at 870–71, where this court found that a taxpayer could deduct under § 212 expenses incurred attempting to recover on a judgment he was awarded in a wrongful termination lawsuit. *Green* is inapposite. In *Green*, the judgment stemmed from the taxpayer's

19

wrongful termination and was primarily intended to compensate the taxpayer for his lost employment income. *Green*, 507 F.3d at 867–68. Here, as established, the transactions underlying Christina Ray's indebtedness to Ames Ray were not profit-motivated or income-generating in nature.

We next consider whether Ray's legal expenses incurred litigating to recover the interest accrued on Christina Ray's indebtedness are deductible under § 212(1). Ray cites *Kelly v. Commissioner*, 23 T.C. 682, 688 (1955), *aff'd*, 228 F.2d 512 (7th Cir. 1956), in which the Tax Court held that the portion of expenses attributable to the recovery of interest on a personal loan may be deducted as expenses incurred for the collection of income. *Kelly*, 23 T.C. at 688–90; *accord Young v. Comm'r*, 113 T.C. 152, 157 (1999), *aff'd*, 240 F.3d 369 (4th Cir. 2001). The Commissioner does not dispute this caselaw but argues that Ray has forfeited this argument because he did not raise it in the Tax Court.

As previously discussed, an argument not raised before the trial court cannot be raised for the first time on appeal. *XL Specialty Ins. Co.*, 513 F.3d at 153 (citing *Stokes*, 217 F.3d at 358 n.19). For an argument to be preserved, it "must be raised to such a degree that the trial court may rule on it." *Id.* (quoting *In re Fairchild Aircraft Corp.*, 6 F.3d at 1128).

Ray did not raise his *Kelly* argument before the Tax Court, and barely argued for the § 212 deductibility of his legal expenses in his pre-trial and post-trial briefing. This argument, then, was not raised to such a degree that the Tax Court could have ruled on it. Ray has thus failed to preserve any argument he might have that the portion of his legal fees attributable to his efforts to recover the interest on his ex-wife's indebtedness is deductible under § 212(1).

No. 20-60004

## V.

The Tax Court found Ray liable for an accuracy-related penalty under Internal Revenue Code § 6662, which imposes a 20 percent penalty on tax underpayments attributable to the taxpayer's "[n]egligence or disregard of rules or regulations" *or* "substantial understatement of income tax." I.R.C. §§ 6662(a), (b)(1), (b)(2).[2] Because the Tax Court found that Ray could deduct his trading agreement loss-related legal expenses under § 212, the computation adopted by the Tax Court did not impose a penalty on any underpayment attributable to legal expenses concerning the trading agreement losses, which Ray was allowed to deduct under § 212. But the Tax Court did impose a penalty on Ray's underpayment attributable to (1) the difference in the amounts Ray would be allowed to deduct for legal expenses for the trading agreement losses if they were deductible under § 162(a) rather than § 212, and (2) Ray's deduction of his legal expenses relating to his litigation to recover on his ex-wife's indebtedness.

On appeal, Ray argues that the Tax Court erred in finding him liable for an accuracy-related penalty because he is entitled to both a "reasonable cause and good faith" defense and a "substantial authority" defense to the imposition of the penalty. The Commissioner responds that Ray has failed to meet his burden of proving these defenses. We address Ray's entitlement to each of these asserted defenses in turn.

## A.

An accuracy-related penalty does not apply to any portion of a taxpayer's underpayment for which the taxpayer had "reasonable cause"

---

[2] An understatement of income tax is substantial if the amount of understatement exceeds the greater of 10 percent of the taxpayer's total tax liability or $5,000. I.R.C. § 6662(d)(1)(A).

and acted in good faith. I.R.C. § 6664(c)(1). The taxpayer bears the burden of proving entitlement to the reasonable cause and good faith defense. *Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 548 (5th Cir. 2009); *accord Brinkley*, 808 F.3d at 668. The assessment of whether the taxpayer has met this burden is "made on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1); *Brinkley*, 808 F.3d at 669. "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Treas. Reg. § 1.6664-4(b)(1). "The most important factor[,]" however, "is the extent of the taxpayer's effort to assess his proper liability in light of all the circumstances." *Klamath*, 568 F.3d at 548. The Tax Court's determinations regarding the taxpayer's eligibility for a reasonable cause and good faith defense are factual findings reviewed for clear error. *Sun v. Comm'r*, 880 F.3d 173, 181 (5th Cir. 2018).

The Tax Court found that Ray failed to carry his burden of proving his entitlement to the reasonable cause and good faith defense because (1) Ray's reliance on the 1997 stipulated Tax Court decision was unreasonable, as the stipulated decision "does not state or give rise to an inference that petitioner was involved in a computer programming business as he claims here"; and (2) Ray's argument that he made a mistake of law as to the applicability of § 162(a) versus § 212 was meritless because Ray never conceded in the Tax Court proceedings that "he was not engaged in a trade or business or even argue[d] in the alternative that he may only be entitled to a section 212 deduction."

On appeal, Ray again contends that he reasonably relied on the stipulated Tax Court decision in deducting his legal expenses under § 162(a). The Commissioner argues that Ray could not have reasonably relied on the

No. 20-60004

stipulated decision because he was aware of the circumstances surrounding its adoption by the Tax Court and that it was the result of a settlement, he did not present evidence showing that he took any steps to confirm its applicability to his 2014 taxes, and the loss claimed in the prior Tax Court proceeding related solely to the trading agreement losses and not to Christina Ray's indebtedness.

The Commissioner is correct that the stipulated Tax Court decision related solely to Ray's trading agreement losses and not to Christina Ray's indebtedness. As discussed, Ray has failed to show that the claims underlying his first cause of action in *Ray I* are related to the trading agreement venture. However, the 1997 stipulated Tax Court decision is related to the characterization of the trading agreement losses, which implicates the portion of the accuracy-related penalty that was imposed on the difference in the amounts Ray would be allowed to deduct for the relevant legal expenses if they were deductible under § 162(a) rather than § 212. Given the IRS's prior position regarding Ray's trading agreement venture, and considering the particular facts and circumstances of this case, it was reasonable for Ray to have relied upon the stipulated decision in assessing whether his legal expenses could be deducted under § 162(a) as a Schedule C business loss. We conclude that Ray is entitled to a reasonable cause and good faith defense for his understatement attributable to deducting his trading agreement legal fees under § 162(a) rather than § 212.[3]

## VI.

For the foregoing reasons, we AFFIRM the Tax Court's decision, with the exception of the penalty attributable to the difference in the amounts

---

[3] In light of this ruling, we do not reach the issue of whether Ray is entitled to a substantial authority defense.

No. 20-60004

Ray would be allowed to deduct for legal expenses for the trading agreement losses under § 162(a) rather than § 212. As to this exception, we VACATE and REMAND for entry of judgment consistent with this opinion.

No. 20-60004

James L. Dennis, *Circuit Judge*, dissenting in part:

I concur in Parts I through IV of the majority opinion.  However, I respectfully dissent from Part V because, in my view, the Tax Court did not clearly err in finding that Ray was not entitled to the reasonable cause and good faith defense.  The Tax Court's determinations that Ray lacked reasonable cause and was not acting in good faith are factual findings subject to clear error review.  *Green v. Comm'r*, 507 F.3d 857, 871 (5th Cir. 2007).  "Clear error exists when this court is left with the definite and firm conviction that a mistake has been made."  *Id.* at 866.  Whether a taxpayer has proven his or her entitlement to the reasonable cause and good faith defense is a fact-intensive inquiry that is "made on a case-by-case basis, taking into account all pertinent facts and circumstances."  Treas. Reg. § 1.6664-4(b)(1).  Reviewing the record in light of the applicable law and our deferential standard of review, I am not "left with the definite and firm conviction that a mistake has been made."  *See Green*, 507 F.3d at 866.  Because I would affirm fully the Tax Court's decision, I dissent from Part V of the majority opinion.